James GLASPY, Plaintiff,

v.

**R. MALICOAT, Defendant.**

No. 1:99–CV–117.

United States District Court,
W.D. Michigan,
Southern Division.

Feb. 12, 2001.

Daniel E. Manville, Daniel E. Manville, PC, Ferndale, MI, for James Glaspy, plaintiff.

A. Peter Govorchin, Jennifer M. Granholm, Attorney General, Corrections Division, Lansing, MI, for R. Malicoat, in his individual capacity, defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

QUIST, District Judge.

Plaintiff, James Glaspy ("Glaspy"), has sued Defendant, Russell Malicoat ("Mali-

coat"), a corrections officer at the Newberry Correctional Facility, alleging that Malicoat violated his constitutional rights when he refused Glaspy's request to use the bathroom while Glaspy was visiting his son. Pursuant to a written stipulation, the parties have agreed to submit the case to the Court for decision on written briefs and waive their right to a jury trial. In addition to trial briefs, the Court has received and reviewed excerpts of various deposition transcripts, documents, and a videotape from a surveillance camera submitted by the parties. The case is now ready for decision.

### Findings of Fact

On July 14, 1998, Glaspy, who was then 69 years old, traveled to the Newberry Correctional Facility (the "Facility") to visit his son, James Williams ("Williams"), who was incarcerated at the Facility. Glaspy's visit with Williams, which occurred in the visiting room of the Facility, began at approximately 3:00 p.m. At or sometime prior to 4:19 p.m., Glaspy informed Williams that he needed to urinate. At 4:19 p.m., Williams approached the desk/podium in the visiting room to seek permission for his father to use the restroom. At that time, Corrections Officer William Davis ("Davis"), who had been on duty at the desk, was preparing to leave for chow and Malicoat, who had just arrived, was preparing to relieve Davis at the desk. Williams informed Davis that Glaspy needed to use the restroom but Davis denied the request, stating that prisoner count was being taken and no prisoner or visitor movement was allowed during count.[1] Davis told Williams that Glaspy would be permitted to use the restroom when count cleared and then left on his break.

Less than a minute after Davis left, Williams approached the desk again and told Malicoat that his father needed to use the restroom because he was in pain. Malicoat responded that Glaspy would have to wait until the count was completed to use the bathroom. Williams then asked Malicoat how he could take Glaspy's rights away and left the desk. At approximately 4:28 p.m., Glaspy approached the desk and asked Malicoat for permission to use the bathroom, explaining that he was in pain because he had an urgent need to urinate. Alternatively, Glaspy asked that he be allowed to terminate his visit and leave the prison. Glaspy told Malicoat that he did not think he could wait until count was completed.[2] At about the same time, Williams approached the desk and demanded that his father be allowed to use the restroom and asked Malicoat to call his superiors to get permission for Glaspy to use the restroom. Malicoat called the control center at approximately 4:30 p.m. and spoke with Corrections Officer Jason Hubble ("Hubble"), who was on duty in the control center. Malicoat made the call because Williams was becoming very agitated by Malicoat's refusal to allow Glaspy to use the restroom.[3] Malicoat told Hubble that a visitor was requesting use the restroom; Malicoat did not tell Hubble that it was an emergency or that Glaspy

---

1. Prisoner count is a process in which all prisoners are accounted for in the various prison units and facilities and then reconciled with the master list in the control center. (*See* Sistrunk Dep. at 20–21, attached to Def.'s Trial Br.) All prisoner movement stops during count (except in the kitchen) while the count is completed. Michigan Department of Corrections policy requires that each prison facility establish prisoner count procedures and that counts be conducted on a routine basis. (*See* Mich. Dep't. of Corr. Policy Directive 04.04.101 (10/23/95), Def.'s Trial Br. Ex. A.)

2. *See* Malicoat Aff. ¶¶ 12–13, Pl.'s Trial Br. Ex. 5.

3. *See* Mem. from Malicoat to Bergh of 7/21/98, Pl.'s Trial Br. Ex. 26.

could not wait until count was completed.[4] Hubble relayed Malicoat's message to Sergeant Ulysses Sistrunk, who was in charge of conducting the prisoner count. Sergeant Sistrunk denied the request, stating that count would be completed in a few minutes and Glaspy could use the restroom then. Hubble relayed Sergeant Sistrunk's denial to Malicoat, and Malicoat told Glaspy that he would have to wait until count was completed. When Glaspy asked Malicoat about his rights, Malicoat told Glaspy that he lost his rights when he signed in to see his son.

Glaspy and Williams left the desk to return to their seats at 4:32 p.m. Due to his urge to urinate, Glaspy got out of his seat and began to pace back and forth. Malicoat told Glaspy that he had to sit down, and Glaspy did as directed. At approximately 4:35 p.m., Glaspy urinated in his pants. At some point either before or after Glaspy urinated, Glaspy noticed Malicoat laughing at him.[5] Count was completed at 4:42 p.m. At that time, Glaspy was escorted out of the visiting room and he immediately went into the bathroom. When he exited the bathroom, Glaspy went to the information desk and told the desk officer about his problem and Malicoat's refusal to let him use the restroom.

Following the incident, prison officials conducted an investigation. In connection with the investigation, Sergeant Sistrunk stated that had he known that Glaspy was in pain or that his need to use the bathroom was urgent, he would have permitted Glaspy to use the restroom prior to completion of count.[6] In his report, investigator Dave Bergh noted that he was unable to "find anything which supports staffs decision not to allow a visitor to use the restroom during count."[7] At the time of the incident, MDOC policy and the rules of the Facility allowed visitors to use the restroom one time during a visit.[8] No MDOC or Facility rule extended the rule of no prisoner movement during count to visitors or otherwise limited a visitor's use of restroom facilities during count.

Glaspy did not suffer from any medical condition that required him to urinate. In addition, Glaspy did not suffer any bodily injury as a result of not being able to use the restroom.

### Conclusions of Law

■ Glaspy claims that Malicoat violated his substantive due process rights by refusing to permit him to use the restroom after Williams and Glaspy informed Malicoat that Glaspy was in pain and his need to use the restroom was urgent. In order to succeed on his claim, Glaspy must show

**4.** *See* Hubble Dep. at 11, Pl.'s Trial Br. Ex. 30.

**5.** Glaspy claims that Malicoat laughed at him. Malicoat denies that he did so. Malicoat argues that the Court should disbelieve Glaspy's testimony because neither Glaspy nor Williams alleged that Malicoat laughed at Glaspy until after suit was filed. However, Malicoat fails to note that in a memorandum prepared on July 15, 1998, one day after the incident in question, Lieutenant Mark McCullick wrote that Glaspy stated that "Officer Malicoat laughed at him after he urinated in his pants." (*See* Mem. from McCullick to Stephens of 7/15/98, Pl.'s Trial Br. Ex. 12.) In addition, Lieutenant McCullick stated that Glaspy "was very polite" and "stated that all

he wanted to do is ensure that it does not occur again with him or anyone else." (*Id.*) The Court accepts Glaspy's version of events as true because it has been consistent at all times.

**6.** *See* Mem. from Sistrunk to Bergh of 7/17/98, Pl.'s Trial Br. Ex. 9.

**7.** Mem. from Bergh to Stephens of 7/31/98, Pl.'s Trial Br. Ex. 14.

**8.** *See* Mich. Dep't of Corr. Operating Procedure 05.03.140 (4/30/98), Pl.'s Trial Br. Ex. 18; Facility Visiting Rules (10/7/96) ¶ E, Pl.'s Trial Br. Ex. 20.

that: (1) Malicoat deprived him of a right secured by the Constitution or laws of the United States; and (2) Malicoat was acting under color of state law. *See Perry v. McGinnis,* 209 F.3d 597, 603 (6th Cir. 2000); *Huron Valley Hosp., Inc. v. City of Pontiac,* 887 F.2d 710, 714 (6th Cir.1989) (stating that "[s]ection 1983 authorizes the courts to redress violations of 'rights, privileges, or immunities secured by the Constitution and [federal] laws' that occur under color of state law") (quoting 42 U.S.C. § 1983) (alteration in original). There is no dispute that Malicoat was acting under color of state law while on duty at the visiting room of the Facility. Thus, the only question is whether Malicoat violated Glaspy's constitutional rights.

Glaspy contends that Malicoat's actions violated his rights under the substantive due process component of the Fourteenth Amendment. The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause has two components, one procedural and the other substantive. *See Seal v. Morgan,* 229 F.3d 567, 574 (6th Cir.2000). The procedural component governs procedures by which the State may deprive a person of life, liberty, or property. *See id.* The substantive due process component is not concerned with whether procedures were followed, but rather "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986). Substantive due process encompasses, in addition to those rights expressly set forth in the Bill of Rights, "fundamental rights implicit in the concept of ordered liberty, and deeply rooted in this Nation's history and tradition[s]." *Kallstrom v. City of Columbus,* 136 F.3d 1055, 1060 (6th Cir.

1998) (citations and internal quotations omitted) (alteration in original).

In *Seal,* the Sixth Circuit observed that fundamental rights subject to protection from arbitrary governmental action include: "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, to terminate one's pregnancy, and possibly the right to refuse unwanted lifesaving medical treatment." *Seal,* 229 F.3d at 574–75 (citing *Washington v. Glucksberg,* 521 U.S. 702, 720, 117 S.Ct. 2258, 2267, 138 L.Ed.2d 772 (1997)). Neither party has cited a case specifically holding or suggesting that the opportunity to urinate constitutes a fundamental right, although Malicoat does not dispute that it does. In *West v. Dallas Police Department,* No. Civ. A. 3–95CV–1347P, 1997 WL 452727 (N.D.Tex. July 31, 1997), the plaintiff alleged that the defendants violated his constitutional rights by, among other things, refusing to allow him access to the restroom at a jail while he was a pretrial detainee. In addressing the defendants' motion for summary judgment based on qualified immunity, the court began its analysis by noting that because the plaintiff was a pretrial detainee, his claim was properly analyzed under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment. *See id.* at *4. The court then examined whether the alleged right at issue, which the court characterized as the right to urinate or defecate in reasonable privacy, was clearly established. The court concluded that such a right is protected under the Fourteenth Amendment:

> Indeed, there are few activities that appear to be more at the heart of the liberty guaranteed by the Due Process Claus of the Fourteenth Amendment than the right to eliminate harmful wastes from one's body away from the

observation of others.... the United States Supreme Court has held that the personal, intimate nature of other activities necessitates their protection from unnecessary governmental interference; there is certainly nothing to indicate that an activity as basic and private as urination should not be included as a part of that framework.

*Id.* at *6 (footnote omitted) (citing, among others, *Roe v. Wade,* 410 U.S. 113, 152–53, 93 S.Ct. 705, 726–27, 35 L.Ed.2d 147 (1973)). In addition, the court reasoned that the ability to urinate could also be characterized as a fundamental right protected by the Fourteenth Amendment either as part of a pretrial detainee's right to not to be subjected to punishment without due process or as part of the pretrial detainee's basic human needs the government is required to protect. *Id.* (citing *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321, 2327, 115 L.Ed.2d 271 (1991)).

This Court finds the court's reasoning in *West* applicable in this case. Even though Glaspy was not a pretrial detainee, while he was a visitor in the Facility his freedom was restrained in a manner similar to the restraints on a prisoner's freedom. As seen from the facts above, Glaspy was not free to do as he pleased when he felt the need to urinate. He could not leave the Facility and he was required to obtain permission from the officer in charge of the desk; restroom facilities were not readily available and when Glaspy would be permitted to use them was left completely to prison officials. Thus, under these conditions, the Court concludes that the ability/opportunity to urinate, being a matter of bodily integrity, is a fundamental right subject to due process protection. *See DeShaney v. Winnebago County Dep't of Soc. Servs.,* 489 U.S. 189, 200, 109 S.Ct. 998, 1006, 103 L.Ed.2d 249 (1989) ("In the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause").

Having concluded that Glaspy had a fundamental right to urinate, the Court must still answer the question of whether Malicoat's actions involved "the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis,* 523 U.S. 833, 846, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998). In *Lewis,* the Court held that when a substantive due process claim is based upon the specific act of a government official, the abuse of governmental power must rise to the conscience-shocking level, typically characterized as deliberate indifference to a citizen's constitutional rights. *See id.* at 846–50, 118 S.Ct. at 1717–18. The particular issue in *Lewis* was whether a police officer's actions during a high-speed chase, without an intent to cause harm to the suspect, could give rise to a substantive due process violation. In answering the question in the negative, the Court observed that whether deliberate indifference "shocks" is largely dependant upon the factual setting. The Court noted that in the pretrial custody/prison context, prison officials are normally afforded a reasonable opportunity to give forethought to prisoners' welfare without also being required to give concurrent consideration to another "countervailing interest." *Id.* at 851, 118 S.Ct. at 1719. Thus, where there is an opportunity to deliberate, the deliberate indifference standard is appropriate. *See id.* at 850–52, 118 S.Ct. at 1718–19. On the other hand, where circumstances do not allow for an opportunity to deliberate, as in circumstances involving a prison riot, a higher standard of fault—requiring a showing of intent to do harm, i.e., malicious or sadistic behavior—is appropriate. *Id.* at 852–54,

118 S.Ct. at 1719–20. The Court concluded that such a higher standard of culpability is required in the high speed chase setting because the circumstances are analogous to those of a prison riot:

> Like prison officials facing a riot, the police on an occasion calling for fast action have obligations that tend to tug against each other. Their duty is to restore and maintain lawful order, while not exacerbating disorder more than necessary to do their jobs. They are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made "in haste, under pressure, and frequently without the luxury of a second chance." A police officer deciding whether to give chase must balance on one hand the need to stop a suspect and show that flight from the law is no way to freedom, and, on the other, the high-speed threat to all those within stopping range, be they suspects, their passengers, other drivers, or bystanders.

*Id.* at 853, 118 S.Ct. at 1720 (quoting *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986)) (citations omitted).

■ The Court concludes that the deliberate inference test rather than the higher "malicious or sadistic" test is appropriate in this case because Glaspy's request to Malicoat to use the restroom did not involve a "rapidly evolving, fluid, and dangerous predicament which preclude[d] the luxury of calm and reflective pre-response deliberation." *Claybrook v. Birchwell,* 199 F.3d 350, 359 (6th Cir.2000). Rather, Malicoat had sufficient time to consider different alternatives and act on them. While it is true that prisoner count, an important prison function, was being conducted at the time, unlike a prison riot, prisoner count is a routine procedure that does not require snap judgments requiring balancing of competing interests. Furthermore, although no more than 22–24 minutes elapsed between William's first request that Glaspy be permitted to use the restroom and the end of count, Malicoat had sufficient time to determine how to accommodate Glaspy's need.

Applying the deliberate indifference standard to the facts of this case, the Court concludes that Malicoat's conduct shocks the conscience because Malicoat was deliberately indifferent to Glaspy's federally protected rights. Williams and Glaspy informed Malicoat at least twice that Glaspy needed to urinate and was in pain and that the situation was an emergency. Although Malicoat did ultimately call the control center, he did so not to see what he could do for Glaspy, but instead because Williams was becoming agitated and unruly. And, when Malicoat placed the call, he omitted to inform Officer Hubble that the situation was urgent and that Glaspy said he could not wait until the end of count to use the restroom. The evidence shows that had Malicoat relayed accurate and complete information to the control center, Glaspy would have been permitted to use the restroom. Although Malicoat argues that he was just following procedures and did in fact try to see what could be done by calling the control center, there was no policy in place that prevented visitor use of restroom facilities during count, and the fact that Malicoat laughed at Glaspy's situation demonstrates that Malicoat's actions were malicious and not intended to advance any legitimate governmental interest.[9]

### Damages

■■ Having concluded that Malicoat violated Glaspy's constitutional rights, the

---

9. Because the Court has concluded that Malicoat violated Glaspy's substantive due process right, the Court will not address Glaspy's contention that he had a protected liberty interest created by the MDOC regulations.

Court must address the issue of damages. Glaspy did not suffer any physical harm from the incident, but suffered pain and discomfort for a period of time. Also, an adult urinating in his pants in front of others suffers extreme humiliation. The event also created inconvenience—what to do with the wet clothes, how to sit when going home, etc. Therefore, the Court awards Glaspy $5,000 in compensatory damages. In addition, the Court will award Glaspy punitive damages of $5,000 against Malicoat because Malicoat's actions demonstrate evil motive or intent or callous indifference to Glaspy's federally protected rights. *See Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The Court believes that this amount is sufficient to punish Malicoat for his conduct and to deter similar behavior in the future.

### *Conclusion*

Malicoat violated Glaspy's substantive due process rights by refusing to allow Glaspy to use the restroom on July 14, 1998. Glaspy is awarded compensatory damages of $5,000 and punitive damages of $5,000.

A judgment consistent with these Findings of Fact and Conclusions of Law will be entered.

Plaintiff may apply for attorneys fees and costs.