SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**Lorraine Gormley v. LaTanya Wood-El** (A-101/106-11) (069717)

**Argued November 4, 2013 -- Decided June 30, 2014**

**ALBIN, J., writing for a majority of the Court.**

In this appeal, the Court considers whether injuries suffered by an attorney while interviewing a client at a state psychiatric hospital resulted from a state-created danger that violated her substantive-due-process rights under the Fourteenth Amendment of the United States Constitution and whether defendants are entitled to qualified immunity.

Plaintiff Lorraine Gormley was an attorney employed by the Department of the Public Advocate, Division of Mental Health Advocacy, providing legal representation to clients involuntarily committed in state psychiatric facilities, including Ancora Psychiatric Hospital (Ancora). Each ward at Ancora contained a day room in which up to forty patients, including those who were involuntarily committed and classified as a danger to themselves or others, could congregate. Visiting attorneys and psychiatrists also were required to use the day rooms for professional interviews. Although frequent violence occurred in the day rooms, no security guards or cameras were posted there. From October 2003 through December 2005, Ancora reported almost 4,000 assaults, including 810 assaults against staff members and visitors, 200 of which resulted in injuries.

In September 2005, Gormley arrived at Ancora to interview clients. She sat in a day room with her back against the wall to prevent attacks from behind. One of her clients was B.R., who was suffering from a psychotic disorder with hallucinations and who had been assigned Continuous Visual Observation (CVO) status because she posed a safety risk to herself and others. Gormley, who was not informed that B.R. was on CVO status, sat near her in order to hear over the noise in the day room. As Gormley turned her head, B.R. hit her several times. Gormley tried to flee, but B.R. grabbed her by the hair, causing her to fall and strike her head on the concrete floor. When Gormley regained consciousness, B.R. was still attacking her. Gormley was out of work for about four months due to her physical and mental injuries.

Gormley filed a civil action against Ancora's CEO, LaTanya Wood-El, and other government officials, in their individual capacities, under both the Federal Civil Rights Act, 42 U.S.C.A. § 1983, and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), alleging that her constitutional right to be free from state-created danger was violated. On defendants' motions for summary judgment, the trial court concluded that Gormley had presented sufficient evidence to proceed on the civil-rights claims under the state-created-danger doctrine. The court deferred deciding whether she was entitled to injunctive relief.

The Appellate Division concluded that the trial court erred in failing to dismiss the federal civil-rights claims on qualified-immunity grounds. Gormley v. Wood-El, 422 N.J. Super. 426 (App. Div. 2011). Although the panel determined that defendants violated Gormley's Fourteenth Amendment substantive-due-process rights under the state-created-danger theory, it found that defendants had qualified immunity because these rights were not clearly established at the time she was attacked. The panel did not address Gormley's claim for relief under the New Jersey Civil Rights Act or her claim for injunctive relief. Gormley moved for leave to appeal the dismissal of her claims based on qualified immunity, and defendants moved for leave to appeal the upholding of the civil-rights claims under the state-created-danger theory. The Court granted the motions filed by Gormley, 210 N.J. 25 (2012), and defendants, 216 N.J. 337 (2012).

**HELD:** Under the facts of this case, a lawyer assigned to represent a client civilly committed to a state psychiatric hospital had a substantive-due-process right to be free from state-created dangers. Because that right was clearly established at the time the lawyer was attacked, the state official defendants are not entitled to qualified immunity.

1. Viewing the evidence in the light most favorable to Gormley, the Court first considers whether a jury could find that defendants violated Gormley's federal substantive-due-process right to be free from state-created danger. The analysis of this right is the same under both the Federal and New Jersey Civil Rights Acts. Although the Due Process Clause of the Fourteenth Amendment protects against the government's arbitrary deprivation of a liberty interest, it does not generally confer an affirmative right to governmental aid to secure a liberty interest or confer governmental protection to individuals from violence by private actors. Rather, the constitutional threshold is only met if the State either creates the danger that proximately causes the injury or renders the victim more vulnerable to danger. (pp. 22-29)

2. In Bright v. Westmoreland County, 443 F.3d 276 (3d Cir. 2006), cert. denied, 549 U.S. 1264 (2007), the United States Court of Appeals for the Third Circuit developed a standard for application of the state-created-danger doctrine, requiring a plaintiff to satisfy a four-prong test: (1) the ultimate harm must be foreseeable and direct; (2) the conduct of the state actor must shock the conscience; (3) the plaintiff must be a specifically foreseeable victim or part of a discrete class of foreseeable victims; and (4) the state actor must affirmatively use his authority either to create a danger or render a person substantially more vulnerable to injury. Conscience-shocking conduct occurs if the state actor intentionally causes unjustifiable harm, but not if the harm arises from negligence. For scenarios between these two extremes, courts must conduct a fact-sensitive analysis since deliberate indifference that shocks the conscience in one environment may not in another. Status as a state employee is not dispositive of the right to pursue a Section 1983 claim. (pp. 29-37)

3. Adopting and applying the Bright state-created danger test, the Court concludes that Gormley was a member of a discrete class of victims subject to the foreseeable harms set in motion by defendants. Defendants controlled the movements of residents and visitors within Ancora, where assaults in day rooms were common and fairly foreseeable. Defendants affirmatively used their authority to create the danger that rendered Gormley vulnerable to the assault by establishing the regulations and environment to which Gormley had to submit while at Ancora. Sufficient evidence exists to support Gormley's claim that defendants acted with deliberate indifference to the foreseeable dangers threatening attorneys assigned to represent committed patients. Thus, a rational jury could find that all four Bright factors are met and that defendants violated Gormley's substantive-due-process right to be free from state-created dangers under the Fourteenth Amendment of the United States Constitution. Responding to the dissent, the Court explains that it looked to the totality of the circumstances, rather than individual factors, to discern the conscience-shocking conduct because no single brushstroke reveals the whole picture. In light of the unique level of violence at Ancora, its conclusion will not open a floodgate of litigation against public entities. (pp. 37-47)

4. The application of qualified immunity is a matter of law for a court to decide. Under this doctrine, government officials are shielded from a suit for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. This balances the need to hold public officials accountable when their conduct is irresponsible against the need to shield them when they perform their duties reasonably. In order for a right to be clearly established, its contours must be sufficiently clear so that a reasonable official would know that his conduct is violating that right. In the present case, the Court concludes that Gormley's right to be free from state-created danger was clearly established at the time of the assault. In light of the history of violence at Ancora and the requirement that attorneys meet with clients in the chaotic day rooms, reasonable hospital administrators knew or should have known that the conditions they created breached the substantive-due-process guarantee of the United States Constitution. Thus, the Court reverses the Appellate Division's dismissal of the federal civil rights claim on qualified-immunity grounds. Finally, even if qualified immunity were granted to defendants, Gormley would still have the right to pursue injunctive relief. (pp. 47-52)

The judgment of the Appellate Division is **AFFIRMED IN PART** and **REVERSED IN PART** and the matter is **REMANDED** to the trial court for further proceedings in accordance with the Court's opinion.

**JUSTICE LaVECCHIA, DISSENTING,** joined by **JUSTICE PATTERSON,** expresses the view that a substantive state-created-danger claim was not presented in this matter, and the majority's holding to the contrary will impact numerous governmental operations in settings such as schools and prisons, while the totality-of-the-circumstances approach leaves government officials uncertain as to their risk of personal liability. Moreover, even if a claim were presented, it was not clearly established at the time Gormley suffered her injuries, thereby rendering

2

defendants qualifiedly immune from suit.

**CHIEF JUSTICE RABNER and JUDGE RODRÍGUEZ (temporarily assigned) join in JUSTICE ALBIN's opinion. JUSTICE LaVECCHIA filed a separate dissenting opinion, in which JUSTICE PATTERSON joins. JUDGE CUFF (temporarily assigned) did not participate.**

LORRAINE GORMLEY,

    Plaintiff-Appellate
    and Cross-Respondent,

        v.

LATANYA WOOD-EL, Chief
Executive Officer, Ancora
Psychiatric Hospital;
JENNIFER VELEZ, Current
Commissioner and WILLIAM
WALDMAN, Former Commissioner,
New Jersey Department of
Human Services; KEVIN
MARTONE, Current Assistant
Commissioner; and ALAN G.
KAUFMAN, Former Director,
Division of Mental Health
Services, Department of Human
Services,

    Defendants-Respondents
    and Cross-Appellants.

Argued November 4, 2013 – Decided June 30, 2014

On appeal from the Superior Court, Appellate
Division, whose opinion is reported at 422
N.J. Super. 426 (2011).

Justin T. Loughry argued the cause for
appellant and cross-respondent (Loughry and
Lindsay, attorneys; Mr. Loughry and Lawrence
W. Lindsay, on the briefs).

Michael C. Walters, Assistant Attorney
General, argued the cause for respondents
and cross-appellants (John H. Hoffman,
Acting Attorney General of New Jersey,
attorney; Lewis A. Scheindlin, Assistant

Attorney General, of counsel; Mr. Walters and Randall B. Weaver, Deputy Attorney General, on the briefs).

JUSTICE ALBIN delivered the opinion of the Court.

Lorraine Gormley was assigned to provide legal representation to an involuntarily committed patient at a state-run psychiatric hospital.  To prepare for an upcoming commitment hearing, at the direction of hospital officials, Gormley met with her client in the hospital's unsupervised day room, a place where psychotic patients milled about and where violence frequently erupted.  During the meeting, Gormley's mentally disturbed client suddenly and brutally attacked her, inflicting serious bodily injuries.

Gormley filed a civil action against the chief executive officer of the hospital and officials at the Department of Human Services under both the Federal Civil Rights Act, 42 U.S.C.A. § 1983, and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c), and under the state common law.  She alleged that these officials violated her constitutional right to be free from state-created danger, a right protected by the substantive-due-process guarantee of the United States Constitution.

The trial court denied summary judgment to the defendant state officials on both Gormley's federal and state civil-rights claims but dismissed her common-law claim.  The Appellate Division determined that Gormley presented sufficient evidence

2

to establish a violation of her federal constitutional rights. It held, however, that those rights were not clearly established at the time of the assault on Gormley and therefore dismissed the claims against the officials on the ground of qualified immunity.[1] Gormley v. Wood-El, 422 N.J. Super. 426, 444 (App. Div. 2011).

We now reverse. We hold that, in this case, the lawyer assigned to represent a client civilly committed in a state psychiatric hospital had a substantive-due-process right, guaranteed by the Fourteenth Amendment of the United States Constitution, to be free from state-created dangers. We also hold that the right was clearly established at the time Gormley was viciously attacked by her client in the confines of the hospital. We therefore conclude that the Appellate Division erred in granting the state officials qualified immunity. This matter is remanded to the trial court for further proceedings consistent with this opinion.

I.

A.

In September 2005, Lorraine Gormley was an attorney employed by the Department of the Public Advocate, Division of

---

[1] The Appellate Division did not address Gormley's state constitutional claim.

Mental Health Advocacy.[2]  Gormley was assigned to provide legal representation to clients involuntarily committed in state psychiatric facilities, such as Ancora Psychiatric Hospital (Ancora), a facility staffed and managed by the New Jersey Department of Human Services, Division of Mental Health Services.  Patients involuntarily committed have a right to counsel at their commitment hearings, and those who are indigent have a right to appointed counsel.  See In re S.L., 94 N.J. 128, 142 (1983).  On September 22, 2005, while at Ancora, Gormley met for the first time with her client B.R., a 21-year-old woman committed sixteen days earlier for a "psychotic disorder" that induced hallucinations.  At the start of the interview in the hospital's crowded and chaotic day room, B.R. violently attacked Gormley in the presence of hospital staff.

Two years later, Gormley filed a two-count complaint, naming as defendants various officials employed by the Department of Human Services:  LaTanya Wood-El, Chief Executive Officer of Ancora; Jennifer Velez, the current Human Services Commissioner; William Waldman, its former Commissioner; Kevin Martone, Assistant Commissioner in the Division of Mental Health Services; Alan Kaufman, former Director of the Division of Mental Health Services; and John and Jane Doe employees and

---

[2] The Division of Mental Health Advocacy was transferred to the Office of the Public Defender in 2010.  L. 2010, c. 34, § 30 (codified at N.J.S.A. 52:27EE-37).

4

supervisors at Ancora.  In the complaint, Gormley asserts causes of action under the Federal Civil Rights Act, 42 U.S.C.A. § 1983, and the New Jersey Civil Rights Act, N.J.S.A. 10:6-2(c). She alleges that defendants violated her substantive-due-process rights guaranteed by the New Jersey and Federal Constitutions. She asserts that these officials acted with deliberate indifference to her physical safety in the face of known dangers within their control.  She maintains that they failed to take reasonable steps to safeguard her from a violent assault and failed to train or supervise the hospital staff on how to promptly prevent or stop such an assault.  Gormley also brought a common-law tort claim, asserting that defendants failed to maintain the hospital in a safe condition for persons, such as her, who are required to be on the premises for business or professionally related matters.  She seeks compensatory and punitive damages, attorney's fees and costs, and injunctive relief.  Although the complaint does not specify whether defendants were sued in their individual or official capacities, or both, Gormley made clear at the summary-judgment hearing that defendants were sued only in their individual capacities.[3]

---

[3] "Personal-capacity suits . . . seek to impose individual liability upon a government officer for actions taken under color of state law."  Hafer v. Melo, 502 U.S. 21, 25, 112 S. Ct. 358, 362, 116 L. Ed. 2d 301, 309 (1991).  When an official is sued in his individual capacity, he is personally liable for any

5

B.

At the conclusion of discovery, defendants moved for summary judgment on all claims. The trial court dismissed the common-law claims but not the federal and state civil-rights claims. After granting defendants' motion for leave to appeal, the Appellate Division agreed with the trial court that there was a triable issue of whether defendants violated Gormley's federal right to substantive due process. The Appellate Division, nevertheless, concluded that that right was not clearly established at the time of the assault on Gormley and therefore granted defendants qualified immunity and dismissed the federal civil-rights claim. The Appellate Division did not address the state civil-rights claim. The parties, however, have proceeded as though the Appellate Division dismissed the state civil-rights claim on qualified-immunity grounds as well.

---

judgment resulting from his violation of another's federal rights. Ibid.

In contrast, an official-capacity suit "is not a suit against the official [personally] but rather is a suit against the official's office." Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 109 S. Ct. 2304, 2312, 105 L. Ed. 2d 45, 58 (1989). "[A]n award of damages against an official in his personal capacity can be executed only against the official's personal assets," whereas an award against him in his official capacity can be executed against the government entity itself, which is the real party in interest. Kentucky v. Graham, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105, 87 L. Ed. 2d 114, 121 (1985).

6

Gormley appeals from the Appellate Division's dismissal of her civil-rights claims on the basis of qualified immunity. Defendants appeal from the Appellate Division's holding that they violated Gormley's right to substantive due process. In both appeals, we must determine whether defendants were entitled to summary judgment.

A court should grant summary judgment only when the record reveals "no genuine issue as to any material fact" and "the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). In deciding whether summary judgment was either properly granted or denied, "we apply the same standard governing the trial court -- we view the evidence in the light most favorable to the non-moving party." Murray v. Plainfield Rescue Squad, 210 N.J. 581, 584 (2012). In this appeal, we must therefore view the summary-judgment record through the prism of Gormley's best case, giving Gormley -- the non-moving party -- the benefit of the most favorable evidence and most favorable inferences drawn from that evidence. See id. at 584-85.[4]

The parties dispute how we should construe the substantive-due-process guarantee of the Federal Constitution and the federal and state civil-rights statutes. Our standard of review in construing the meaning of a constitutional provision or a

---

[4] It bears mentioning that, for the most part, the facts are not in dispute.

7

statute is de novo; we do not defer to the interpretative conclusions of the trial court or Appellate Division.  See Nicholas v. Mynster, 213 N.J. 463, 478 (2013); Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

With these principles of law in mind, we turn first to the summary-judgment record.

II.

A.

In September 2005, Ancora was comprised of five secure patient buildings, including the Cedar Building.  That building predominantly housed involuntarily committed patients suffering mental illnesses who were classified as a danger to themselves, others, or property.  Cf. N.J.S.A. 30:4-27.2(m) (defining "in need of involuntary commitment").  The Cedar Building was divided into four locked wards.  Each ward had a roughly thirty-foot by thirty-foot day room that included a television, tables, and chairs.

According to one source, "bedlam" reigned in these day rooms.  At times, an entire ward of thirty-five to forty patients would be in attendance in a day room where professionals, such as attorneys or psychiatrists, might be present.  No security guards were posted to provide protection in the day rooms or anywhere at Ancora other than the

8

entranceway to the hospital. The day rooms were the scene of frequent fights and violence. Often, attorneys and psychiatrists were the victims of assaults by patients.

Although Ancora had a policy that provided for family members to meet with patients in quiet, private rooms, supervised by a staff member, lawyers were relegated to the noisy, violent, and combustible day rooms to conduct client interviews.

Ted Novak, an attorney in the Office of the Public Advocate and Gormley's supervisor, testified that he had been assaulted three times by patients at Ancora before the attack on Gormley. He noted that similar facilities had security guards but none were present at Ancora. He explained that when interviewing a client in the day room there would be "a lot of noise from psychotic patients who [were] going off" and "screaming." He would constantly look over his shoulder to make certain he was safe.

Three staff psychiatrists gave deposition testimony that patients assaulted them on various occasions at Ancora, with some of those assaults occurring in the day rooms of the Cedar Building. One of those psychiatrists had to undergo nasal surgery after a patient assault. The same psychiatrist described an incident in which a resident ran across a day room to attack her while she interviewed a patient. The

9

psychiatrist's patient -- not a staff member at Ancora -- intervened to prevent the assault. Then the psychiatrist had to intercede to stop her patient from pummeling her assailant. Ancora's CEO, LaTanya Wood-El, knew about this incident yet, when deposed, could not remember if she took any steps to prevent a recurrence. Two staff psychiatrists testified that, unlike Ancora, other psychiatric hospitals where they had worked provided security guards and private rooms for patient interviews.

From October 2003 through December 2005, Ancora recorded 3846 assaults committed by patients on its grounds, including 810 assaults committed against staff members and visitors. Of those 810 assaults, injuries were suffered in 200 cases. Gormley filed an expert report from Robert Sadoff, a psychiatrist with forty-five years of experience examining patients committed to state hospitals. Dr. Sadoff stated that he knew "of no other hospital or facility with similar numbers of assaults" or lack of protective safeguards for professionals conducting interviews or examinations. In his more than four decades of practice in psychiatric hospitals, he conducted patient interviews in a private room with a security guard available if needed. He had never been attacked while examining a patient at a hospital. In his view, an "attorney requires not only privacy to examine and interview her client, but also needs

the security of a security guard, as exists in most other psychiatric hospitals." He concluded that Ancora should have had in place protocols and standards for the protection of visiting professionals.

Gormley's other expert, Mark Rappaport, a Quality Care Facility Review Specialist employed by the State of New York, came to the same basic conclusion in a report he submitted: "[T]he day room is [a] . . . potentially dangerous place for often confidential, sensitive, and personal interviews between patients and visitors (including attorneys) to take place."

B.

On September 22, 2005, Gormley arrived at Ancora to meet with clients whom she had been appointed to represent at commitment hearings that week. One of those clients was B.R., a 21-year-old woman involuntarily committed sixteen days earlier. B.R. was suffering from a "psychotic disorder due to medical condition with hallucinations." B.R. was confined to a ward in the Cedar Building and assigned Continuous Visual Observation (CVO) status. CVO status is conferred on "patients who demonstrate a safety risk to self, others, and property." In accordance with Ancora's protocols, B.R.'s CVO status required an assigned staff member to keep her under "continual visual observation" at all times.

11

Gormley entered the ward's day room and sat at a small table awaiting her client. As a precaution, she placed her back against the wall so that no one could attack her from behind. Ancora offered no option of a separate interview room, did not post security guards, did not use an electronic camera to monitor the day room, and did not provide Gormley with access to an emergency call device. In the day room, patients -- many in psychotic states, a majority posing a danger to themselves and others -- were freely milling about.

A staff member located and brought B.R. to the day room. But no one informed Gormley that B.R. was on CVO status based on a safety-risk assessment. B.R. sat at the table where she was to be interviewed. Gormley positioned herself catty-corner to B.R. because the noise in the day room made it impossible to hear B.R. from across the table while conducting a confidential interview. With the two in close physical proximity to each other, the interview began. As Gormley turned her head to write some notes, B.R., suddenly and without warning, struck Gormley about the head and face several times. As Gormley attempted to flee, B.R. grabbed her by the hair and pulled her backward, causing her to fall and strike her head against the concrete floor. Gormley lost consciousness. She awakened to find B.R. continuing to attack her. No one intervened to stop the assault. As Gormley tried to protect herself by kicking B.R.,

12

she heard an encouraging voice say, "That's it. Kick her off of you." Gormley freed herself without anyone coming to her aid.[5] Staff then escorted B.R. out of the day room.

Gormley "was dazed and in pain and was unable to walk or drive anywhere." One of her colleagues from the Division of Mental Health Advocacy transported her to the infirmary on the grounds of Ancora, and from there she went to the emergency room at Virtua Hospital. In all, Gormley was out of work three to four months due to her injuries. In addition to the physical head injury, she suffered memory loss, cognitive and visual impairment, sleep disturbances, extreme fatigue, and post-traumatic stress disorder. In 2009, she was on a four-day work schedule and receiving "treatment from a neurologist, psychologist, cognitive therapist, and neuro-therapist."

When deposed, CEO Wood-El was asked whether, after the assault on Gormley, she instituted "any changes with respect to how attorney/patient visits were handled." She responded, "No. I wouldn't be required to."

III.

A.

---

[5] One staff member stated otherwise but, as noted earlier, at this procedural posture the evidence must be viewed in the light most favorable to plaintiff.

Defendants moved for summary judgment on all of Gormley's claims. The trial court dismissed Gormley's state common-law claim, finding that the Workers' Compensation Act provided the exclusive remedy for that claim.[6] On the other hand, the trial court denied defendants' summary-judgment motion to dismiss the federal and state civil-rights claims on substantive-due-process and qualified-immunity grounds. The court concluded that Gormley had presented sufficient evidence to proceed under the state-created-danger doctrine, leaving for the jury the ultimate decision whether defendants violated Gormley's rights and leaving for the court's later consideration whether those rights were clearly established at the time of the day-room assault. The court also deferred resolving whether Gormley was entitled to injunctive relief.

B.

The Appellate Division granted leave to appeal and concluded that the trial court erred in failing to dismiss the federal civil-rights claims on qualified-immunity grounds. Although the Appellate Division "[r]eversed and remanded for the entry of an order granting summary judgment dismissing plaintiff's Section 1983 claims," Gormley, supra, 422 N.J.

---

[6] It is noteworthy that, at the summary-judgment hearing, the Deputy Attorney General representing defendants expressed that he did not believe that Gormley's status as "a state employee impacts on her federal rights."

14

Super. at 444, it did not address two remaining issues --

Gormley's claim for relief under the New Jersey Civil Rights Act

and her claim for injunctive relief.

On the Section 1983 claim, the Appellate Division first

determined that the facts, viewed in the light most favorable to

Gormley, demonstrated that defendants violated Gormley's

Fourteenth Amendment substantive-due-process rights under the

state-created-danger theory. Id. at 440. In support of that

theory of constitutional liability, the panel cited a number of

federal courts of appeals, including the Third Circuit Court of

Appeals. Id. at 436-37 (citing Kneipp v. Tedder, 95 F.3d 1199,

1205 (3d Cir. 1996)). In particular, the panel looked to the

Third Circuit's four-factor test for satisfying the state-

created-danger doctrine:

> (1) the harm ultimately caused was
> foreseeable and fairly direct;
>
> (2) the state actor acted in willful
> disregard for the safety of the plaintiff;
>
> (3) there existed some relationship between
> the state and the plaintiff; [and]
>
> (4) the state actors used their authority to
> create an opportunity that otherwise would
> not have existed for the third party's crime
> to occur.
>
> [Kneipp, supra, 95 F.3d at 1208 (line breaks
> added) (quoting Mark v. Borough of Hatboro,
> 51 F.3d 1137, 1152 (3d Cir.), cert. denied,
> 516 U.S. 858, 116 S. Ct. 165, 133 L. Ed. 2d

15

107 (1995)), quoted in Gormley, supra, 422 N.J. Super. at 437.]

The panel focused on the fourth factor, which "is predicated upon the states' affirmative acts which work" to render a citizen more vulnerable to danger. Gormley, supra, 422 N.J. Super. at 437-38 (internal quotation marks omitted) (quoting Bright v. Westmoreland Cnty., 443 F.3d 276, 282 (3d Cir. 2006), cert. denied, 549 U.S. 1264, 127 S. Ct. 1483, 167 L. Ed. 2d 228 (2007)). The panel found that the evidence supported that fourth factor: Gormley's "liberty was restrained, albeit in a temporary sense, as soon as she entered Ancora to provide the constitutionally-mandated services"; Gormley had no choice but to meet with her client at Ancora; Gormley "had no ability to dictate the conditions under which she met with her client, including the location of the consultation session"; the Ancora staff knew that B.R. posed a risk of harm to others; Gormley was not told of B.R.'s CVO status; defendants were "acutely aware of the history of assaultive behavior by its patients against" other patients, staff, and visitors; and, last, "defendants failed to take appropriate measures to safeguard individuals such as [Gormley] from physical attack." Id. at 439. Given these facts, the panel held that defendant state actors rendered Gormley "vulnerable to foreseeable injury by their deliberate

indifference to her safety needs." Id. at 440 (citation and internal quotation marks omitted).[7]

However, the panel also held that Gormley's substantive-due-process right to be free from state-created dangers was not clearly established at the time B.R. attacked her "and continue[s] to remain unclear, not having been addressed by the [United States] Supreme Court or [the New Jersey Supreme] Court." Id. at 444. Accordingly, the panel granted defendants qualified immunity on the basis that "defendants did not engage in any affirmative acts to create the dangerous condition," even if they were deliberately indifferent to "the foreseeable risk of harm" to Gormley. Id. at 443.

C.

Gormley moved for reconsideration, arguing that her right to injunctive relief was not extinguished by the grant of qualified immunity to the individual named defendants. The Appellate Division denied that motion without comment.

Gormley then moved for leave to appeal the Appellate Division's dismissal of her claims based on qualified immunity, and defendants moved for leave to appeal the Appellate Division's upholding of the civil-rights claims under the state-

---

[7] The Appellate Division rejected defendants' contention that plaintiff was barred from suit as their employee. See id. at 438 ("[P]laintiff was not an Ancora employee . . . . Nor was she an employee of the Department of Human Services or any of its divisions.").

17

created-danger theory.  We granted the motions filed by Gormley,
210 N.J. 25 (2012), and defendants, 216 N.J. 337 (2012).


IV.

A.

Defendants assert that the "Fourteenth Amendment does not
impose a duty on State officials to protect fellow State
employees (or the public generally)" from violence by private
individuals unless the State either has a "special relationship"
to the plaintiff or "affirmatively acts to create a danger to
the plaintiff she would not face absent the [S]tate's
affirmative action."  Defendants argue that the Appellate
Division erred in finding a state-created-danger cause of action
even though defendants "did not affirmatively act to create a
danger to [Gormley] that was not inherent in her freely chosen
work."  Defendants emphasize that Gormley entered Ancora
voluntarily and that her liberty was not restrained inside, even
temporarily.  Defendants distinguish their substantive-due-
process obligation to protect involuntarily committed patients
from those who freely enter the institution.  Defendants take
the position that the substantive-due-process guarantee of the
Federal Constitution does not require Ancora to provide security
for a visitor, even if the hospital officials have knowledge
about the violent tendencies of an individual patient and direct

18

and control where the visitor must meet the patient.  Defendants do concede that if the Ancora officials affirmatively mislead a visitor about the dangers presented by a patient then the state-created-danger theory might apply.

Defendants also argue that a constitutional violation cannot arise from defendants' failure to provide Gormley a safe workplace, citing Collins v. City of Harker Heights, 503 U.S. 115, 112 S. Ct. 1061, 117 L. Ed. 2d 261 (1992).  They submit that the Workers' Compensation Act is the exclusive remedy for Gormley because she and defendants are all State employees.

In contrast, Gormley argues that the Appellate Division properly found that she had presented sufficient evidence to establish a violation of her substantive-due-process rights. She highlights that she was a court-appointed attorney rendering constitutionally required representation to an involuntarily committed patient at Ancora -- "a locked facility" -- in a ward controlled by defendants and that she was not "injured in the free world by some private actor" over whom defendants had no control.  In Gormley's view, to establish state-created-danger liability in the circumstances of this case, it is enough to show that defendants took no measures to protect her after they brought her into close proximity with someone they knew to be violent and then abandoned her to that violence.  According to Gormley, the United States Constitution protects her from the

19

exercise of state authority that "create[s] an opportunity that otherwise would not have existed for the third party's crime to occur."

Gormley, moreover, rejects the notion that she had an employee-employer relationship with defendants who "operated Ancora and created the dangerous visiting environment for outside professionals." Last, she maintains that because defendants restrained her ability to act for herself inside the facility, they had a "special relationship" to her -- an affirmative duty to take steps necessary to ensure her safety.[8]

---

[8] Despite the allegations in her complaint, Gormley did not advance or develop her claim that defendants violated the substantive-due-process guarantee of the New Jersey Constitution -- not in her argument before the trial court, not in her brief to the Appellate Division, and not in her brief to or oral argument before this Court. On none of those occasions did she mention Article I, Paragraph 1 of our State Constitution as a substantive-due process source for a state-created-danger doctrine. The failure to squarely address this potential claim may be one reason why the Appellate Division is entirely silent on the issue in its opinion. Only after this Court forwarded a letter to counsel inquiring about the status of the state constitutional claim did Gormley explain that she "reads the Appellate Division's silence on the state statutory and state constitutional claims as not significant. We believe that the Appellate Division would apply its [federal civil rights/constitutional] analysis to the state civil rights statutory/constitutional claims." In other words, Gormley perceives no distinction between the federal and state constitutional analysis.

We decline to address for the first time a potentially new doctrine under our state constitution in light of Gormley's failure to argue or brief the issue, or develop the type of record that would assist the Court in resolving so important a matter. We consider the state-constitutional claim to have

20

B.

Gormley argues that the right to be free from state-created danger, enforceable through Section 1983, was clearly established both in federal courts, including the Third Circuit, and in the Appellate Division at the time Gormley was attacked, and therefore the panel erred in granting qualified immunity to defendants.  She maintains that reasonable hospital administrators would have understood that "putting an individual in danger, increasing his or her risk of harm, or rendering him or her more vulnerable to danger would have violated that individual's Fourteenth Amendment substantive due process rights," citing DiJoseph v. City of Philadelphia, 953 F. Supp. 602, 610 (E.D. Pa. 1997), aff'd, 156 F.3d 1224 (3d Cir. 1998).

Finally, Gormley submits that qualified immunity conferred on individual defendants does not deprive her of the right to injunctive relief to remedy an ongoing constitutional violation. Gormley continues to represent involuntarily committed clients, except at Ancora on doctor's orders.  Gormley contends she had no obligation to raise her claim for injunctive relief before the Appellate Division because she succeeded on that issue before the trial court.  She asks for this Court to reinstate that claim erroneously dismissed by the panel.

lapsed, and we will resolve only the federal constitutional claim, which has been fully briefed and argued.

21

On the other hand, defendants ask us to affirm the panel's dismissal of the constitutional claims based on qualified immunity. They contend that case law did not place them on notice that the Due Process Clause imposed a duty "to provide [Gormley] with a safe working environment" in a psychiatric hospital. They insist that they could not have known that their conduct was unlawful.

Additionally, they submit that the Appellate Division correctly denied Gormley injunctive relief. Defendants state that Gormley had the obligation to argue that injunctive relief would survive a finding of qualified immunity and that her failure to do so constitutes waiver of the issue before the Appellate Division. They also contend that the issue of injunctive relief is moot because Gormley's doctor has restricted her from counseling clients at Ancora.

V.

Viewing the evidence and evidential inferences in the light most favorable to the non-moving party -- Gormley -- we must decide (1) whether a jury could find that defendants violated Gormley's federal substantive-due-process right to be free from state-created danger; if so, (2) whether the right was clearly established when Gormley suffered her injuries, thus determining the applicability of qualified immunity; and (3) whether

22

injunctive relief is available to Gormley.  We begin our analysis with Gormley's substantive-due-process claim.

## A.

Gormley asserts a cause of action under a provision of the Federal Civil Rights Act of 1871, c. 22, § 1, 17 Stat. 13, 13 (codified as amended at 42 U.S.C.A. § 1983).  That statute provides that any official who, under color of state law, deprives a person of "any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  42 U.S.C.A. § 1983.  Section 1983 is a means of vindicating rights guaranteed in the United States Constitution and federal statutes.  Baker v. McCollan, 443 U.S. 137, 144 n.3, 99 S. Ct. 2689, 2694 n.3, 61 L. Ed. 2d 433, 442 n.3 (1979).

In addition to her federal civil-rights claim, Gormley asserts a claim under the analogous New Jersey Civil Rights Act, N.J.S.A. 10:6-1 to -2.  Section 1983 applies only to deprivations of federal rights, whereas N.J.S.A. 10:6-1 to -2 applies not only to federal rights but also to substantive rights guaranteed by New Jersey's Constitution and laws.  The New Jersey Civil Rights Act provides, in relevant part, that:

> Any person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by

23

> the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State, or whose exercise or enjoyment of those substantive rights, privileges or immunities has been interfered with or attempted to be interfered with, by threats, intimidation or coercion by a person acting under color of law, may bring a civil action for damages and for injunctive or other appropriate relief.
>
> [N.J.S.A. 10:6-2(c) (emphasis added).]

Like Section 1983, N.J.S.A. 10:6-2(c) is a means of vindicating substantive rights and is not a source of rights itself.

Through both Section 1983 and the New Jersey Civil Rights Act, Gormley seeks to vindicate her right to liberty protected by the Fourteenth Amendment. The Fourteenth Amendment analysis under both statutes is the same. That Amendment provides, among other things, that "no State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "The Due Process Clause guarantees more than fair process"; it "provides heightened protection against government interference with certain fundamental rights and liberty interests." Washington v. Glucksberg, 521 U.S. 702, 719-20, 117 S. Ct. 2258, 2267, 138 L. Ed. 2d 772, 787 (1997).

Substantive due process protects many now-familiar fundamental rights, such as the right to marital privacy, Griswold v. Connecticut, 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed.

24

2d 510 (1965); the right to have children, Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942); and the right to bodily integrity, Rochin v. California, 342 U.S. 165, 72 S. Ct. 205, 96 L. Ed. 183 (1952). Additionally, the Fourteenth Amendment's Due Process Clause protects the liberty interest of patients involuntarily committed to state psychiatric hospitals and requires that the State provide safe conditions for confinement. Youngberg v. Romeo, 457 U.S. 307, 315-16, 102 S. Ct. 2452, 2458, 73 L. Ed. 2d 28, 37 (1982). Indeed, the Supreme Court has pronounced that the State also has an "unquestioned duty to provide reasonable safety for all . . . personnel within the [psychiatric] institution." Id. at 324, 102 S. Ct. at 2462, 73 L. Ed. 2d at 42.

The substantive-due-process right that Gormley asserts here is the right to be free from state-created danger, mentioned in DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 201, 109 S. Ct. 998, 1006, 103 L. Ed. 2d 249, 263 (1989). In that case, the mother of Joshua DeShaney sued a county, its Department of Social Services (Social Services), and related officials for depriving her son of his Fourteenth Amendment substantive-due-process right to liberty. Id. at 193, 109 S. Ct. at 1002, 103 L. Ed. 2d at 257. While young Joshua was in the custody of his father, Social Services reviewed complaints

25

and evidence that Joshua was subject to repeated physical abuse by the father.  Id. at 192-93, 109 S. Ct. at 1001, 103 L. Ed. 2d at 257.  Despite substantial evidence of such abuse -- evidence that led the agency to secure temporary protective custody of Joshua -- Social Services dutifully recorded Joshua's injuries but took no action to remove the child from his home.  Ibid.  By age four, Joshua was beaten so severely by his father that he lapsed into a coma and suffered serious brain damage.  Id. at 193, 109 S. Ct. at 1001-02, 103 L. Ed. 2d at 257.

On these facts, the United States Supreme Court held that the "liberty" protected by the Fourteenth Amendment's Due Process Clause did not guarantee Joshua protection from violence from a private person, such as his father.  Id. at 201, 109 S. Ct. at 1006, 103 L. Ed. 2d at 263.  The Court held that the Due Process Clause is "a limitation on the State's power to act, not . . . a guarantee of certain minimal levels of safety and security."  Id. at 195, 109 S. Ct. at 1003, 103 L. Ed. 2d at 258-59.  Thus, although the Due Process Clause protects against the government's arbitrary deprivation of a liberty interest, it does not generally confer an "affirmative right to governmental aid" to secure a liberty interest or generally confer protection to individuals from violence by "private actors."  Id. at 195-96, 109 S. Ct. at 1003, 103 L. Ed. at 258-59.

The Court in DeShaney distinguished other cases in which the State actually took custody of an individual, noting that when the State holds a person against his will, "the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." Id. at 199-200, 109 S. Ct. at 1005, 103 L. Ed. at 261. Thus, under the Eighth Amendment's prohibition against cruel and unusual punishment, the State is required "to provide adequate medical care to incarcerated prisoners" because, having deprived an inmate of his "liberty [to] care for himself, it is only 'just' that the State be required to care for him." Id. at 198-99, 109 S. Ct. at 1005, 103 L. Ed. at 260-61 (alteration in original) (internal quotation marks omitted) (quoting Estelle v. Gamble, 429 U.S. 97, 103-04, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251, 259-60 (1976)); see also Farmer v. Brennan, 511 U.S. 825, 833, 114 S. Ct. 1970, 1976-77, 128 L. Ed. 2d 811, 822-23 (1994) ("[P]rison officials have a duty to protect prisoners from violence at the hands of other prisoners. . . . [H]aving stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." (alteration, footnote, citations, and internal quotation marks omitted)). In line with that reasoning, the Court maintained that, under the Due Process Clause, it is

27

unconstitutional "to confine the involuntarily committed . . . in unsafe conditions."  DeShaney, supra, 489 U.S. at 199, 109 S. Ct. at 1005, 103 L. Ed. at 261 (citing Youngberg, supra, 457 U.S. at 315-16, 102 S. Ct. at 2458, 73 L. Ed. 2d at 37).  In these custodial cases, "[t]he affirmative duty to protect arises . . . from the limitation which [the State] has imposed on [the individual's] freedom to act on his own behalf."  Id. at 200, 109 S. Ct. at 1005-06, 103 L. Ed. 2d at 262.

According to the Court, "[i]n the substantive due process analysis, it is the State's affirmative act of restraining the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty" -- that triggers a duty to protect under the Constitution.  Id. at 200, 109 S. Ct. at 1006, 103 L. Ed. 2d at 262 (emphasis added).  The critical point in DeShaney is that the state actors, albeit bystanders to the cruelties inflicted on Joshua, did not create the danger that led to his tragic condition.  Id. at 201, 109 S. Ct. at 1006, 103 L. Ed. 2d at 262.  The Court reasoned in DeShaney that "[w]hile the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."  Ibid. (emphasis added).

28

In that language, the Court suggested that when the State either creates dangers that proximately cause injury or renders the victim more vulnerable to those dangers, the constitutional threshold has been met. From that language, the state-created-danger doctrine was chiseled. Most federal circuit courts now recognize the state-created-danger doctrine as a basis for a substantive-due-process violation.[9] See Sanford v. Stiles, 456 F.3d 298, 304 (3d Cir. 2006).

The United States Court of Appeals for the Third Circuit has developed a standard for the application of the state-created danger doctrine that is faithful to the language of DeShaney and to the high bar set for proving a substantive-due-process claim. In a Section 1983 state-created-danger cause of action, a plaintiff must present evidence to satisfy the following four-prong test:

---

[9] See, e.g., Pena v. DePrisco, 432 F.3d 98, 107–10 (2d Cir. 2005); Robinson v. Lioi, 536 Fed. Appx. 340, 342 (4th Cir. 2013); Jasinski v. Tyler, 729 F.3d 531, 538 (6th Cir. 2013); Reed v. Gardner, 986 F.2d 1122, 1126 (7th Cir. 1993); Forrester v. Bass, 397 F.3d 1047, 1058 (8th Cir. 2005); Kennedy v. City of Ridgefield, 439 F.3d 1055, 1061 (9th Cir. 2006); Uhlrig v. Harder, 64 F.3d 567, 572 (10th Cir. 1995); Butera v. District of Columbia, 235 F.3d 637, 652 (D.C. Cir. 2001). But see Lockhart-Bembery v. Sauro, 498 F.3d 69, 77 (1st Cir. 2007) ("[W]hile this court and the Supreme Court have discussed the state-created danger theory, neither has ever found the theory actionable on the facts given."); Estate of C.A. v. Castro, 547 Fed. Appx. 621, 626 (5th Cir. 2013) ("'[T]his Court has consistently refused to adopt the state-created danger theory.'" (citations omitted)).

29

(1) "the harm ultimately caused was foreseeable and fairly direct";

(2) a state actor acted with a degree of culpability that shocks the conscience;

(3) a relationship between the state and the plaintiff existed such that "the plaintiff was a foreseeable victim of the defendant's acts," or "a member of a discrete class of persons subjected to the potential harm brought about by the state's actions," as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

[Bright, supra, 443 F.3d at 281 (citations and footnotes omitted) (elaborating on earlier test in Kneipp, supra, 95 F.3d at 1208).]

Factors one and three under the Bright test overlap to some degree. Under factor one, the ultimate harm to the plaintiff must be "foreseeable" and "direct." Compare Kneipp, supra, 95 F.3d at 1208 (holding that highly intoxicated woman's fall down embankment was foreseeable injury after police separated her from companion and then abandoned her in freezing weather), and Wood v. Ostrander, 879 F.2d 583, 590 (9th Cir. 1989) (holding that intoxicated woman was foreseeable victim of sexual assault after police removed her from car driven by drunken driver and left her alone in high-crime area), cert. denied, 498 U.S. 938, 111 S. Ct. 341, 112 L. Ed. 2d 305 (1990), with Henry v. City of

30

Erie, 728 F.3d 275, 282 (3d Cir. 2013) (holding that death in house fire not direct consequence of housing inspector's approval of property), and Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 908 (3d Cir. 1997) (holding that teacher's murder was not foreseeable consequence of school officials allowing construction workers to use unlocked back door).

Under factor three, for foreseeability purposes, the plaintiff must be more than an undifferentiated member of the general public. Rather, the plaintiff must be a specifically foreseeable victim or part of a discrete class of foreseeable victims. Compare Kennedy, supra, 439 F.3d at 1063 (holding evidence sufficient to find police officer liable in shooting of victim by neighbor where officer falsely assured victim that her allegations of sexual abuse against neighbor would not be disclosed without first warning her), and Kneipp, supra, 95 F.3d at 1209, with Martinez v. California, 444 U.S. 277, 285, 100 S. Ct. 553, 559, 62 L. Ed. 2d 481, 489 (1980) (holding that parolee's murder of member of general public "too remote a consequence of the parole officers' action"), and Mark, supra, 51 F.3d at 1153 (holding that failure to screen volunteer firefighter who burned home of non-specified member of public not actionable).

Factor two requires that the conduct of the state actor must "shock the conscience." Although intentionally causing an

31

unjustifiable injury or harm will satisfy this standard, negligently doing so will not. County of Sacramento v. Lewis, 523 U.S. 833, 849, 118 S. Ct. 1708, 1718, 140 L. Ed. 2d 1043, 1059 (1998). In many scenarios falling between these two extremes, whether conduct is conscience-shocking is a fact-sensitive analysis and will depend on whether the officials' conduct is egregious in light of the particular circumstances. Id. at 850, 118 S. Ct. at 1718, 140 L. Ed. 2d at 1060. Thus, "[d]eliberate indifference that shocks in one environment may not be so patently egregious in another." Ibid. When institutional officials have "time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations," deliberate indifference will suffice for substantive-due-process liability. Id. at 853, 118 S. Ct. at 1720, 140 L. Ed. 2d at 1062. Thus, when "extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." Ibid.

On the other hand, when a police officer confronts unforeseen circumstances that demand instant judgment, such as the decision whether to engage in a high-speed car chase, then a claim of indifference will not likely be shocking given the lack of opportunity for considered deliberation. Ibid. That is, "more culpability is required to shock the conscience to the extent that state actors are required to act promptly and under

32

pressure." Schieber v. City of Philadelphia, 320 F.3d 409, 419 (3d Cir. 2003).

Factor four requires that a state official affirmatively use his authority either to create the danger or to render a person "substantially more vulnerable to injury" than he otherwise would have been absent state action. Id. at 416. For liability to attach there must be "affirmative state action" and not just a failure to protect a person from violence by another. Bright, supra, 443 F.3d at 284. Accordingly, liability may attach when an official exercises his authority and creates a dangerous situation for a citizen or makes the citizen more vulnerable to danger than had he not intervened. Estate of Smith v. Marasco, 318 F.3d 497, 507-10 (3d Cir. 2003) (holding evidence sufficient to support liability where police drove mentally disturbed man to flee his house into woods, where he died from exposure); Kneipp, supra, 95 F.3d at 1209, cited in Bright, supra, 443 F.3d at 282-83; Freeman v. Ferguson, 911 F.2d 52, 54 (8th Cir. 1990) (holding evidence sufficient to support liability against police chief for directing officers to ignore pleas for help by estranged wife of chief's friend, who afterwards murdered wife); Wood, supra, 879 F.2d at 588.

A state actor will not escape liability by characterizing his conduct as "inaction" when he has exposed a person to a danger he created through the exercise of his authority. As

33

Judge Posner aptly stated, "If the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982).

B.

The State draws our attention to Collins, supra, 503 U.S. 115, 112 S. Ct. 1061, 117 L. Ed. 2d 261, arguing that there can be no liability in the present case because the State has no constitutional duty to ensure that a workplace is free from danger. But Collins is very different from the case before us.

In Collins, the Supreme Court held that the "liberty" protected in the substantive component of the Fourteenth Amendment's Due Process Clause does not require a municipality "to provide its employees with certain minimal levels of safety." Id. at 127, 112 S. Ct. at 1069, 117 L. Ed. 2d at 274. In that case, a sanitation worker was asphyxiated after entering a manhole to clear a sewer line. Id. at 117, 112 S. Ct. at 1064, 117 L. Ed. 2d at 268. In a Section 1983 action, his widow asserted that the city violated his "'constitutional right to be free from unreasonable risks of harm'" by not warning him of or training or equipping him for "the dangers of working in sewer lines and manholes." Ibid.

34

Significantly, the Court noted that the worker's widow did not "allege that his supervisor instructed him to go into the sewer when the supervisor knew or should have known that there was a significant risk that he would be injured" but instead generally alleged "that the city deprived him of life and liberty by failing to provide a reasonably safe work environment."  Id. at 125-26, 112 S. Ct. at 1069, 117 L. Ed. 2d at 273.  The Court was "not persuaded that the city's alleged failure to train its employees, or to warn them about known risks of harm, was . . . arbitrary, or conscience shocking, in a constitutional sense."  Id. at 128, 112 S. Ct. at 1070, 117 L. Ed. 2d at 275 (emphasis added).  Rather the Court characterized the widow's claim as "analogous to a fairly typical state-law tort claim" involving breach of duty of care.  Ibid.

In deciding Collins, the Court stressed that "[t]he employment relationship . . . is not of controlling significance," and that neither the worker's status as a government employee nor the Court of Appeals's suggestion that deliberate indifference did not equate to "'abuse of governmental power'" was a sufficient reason for the dismissal of the Section 1983 claim.  Id. at 119-20, 112 S. Ct. at 1065-66, 117 L. Ed. 2d at 269-70.  Ultimately, the Supreme Court concluded that the worker's widow did not allege or establish an

35

arbitrary deprivation of liberty.  Id. at 129-30, 112 S. Ct. at 1071, 117 L. Ed. 2d at 276.

Collins clearly demonstrates that Gormley's status as a state employee is not dispositive of her right to pursue a Section 1983 claim.[10]  Moreover, Gormley has arguably presented evidence of not merely unreasonable but conscience-shocking dangerous conditions in the Ancora day room where Gormley was compelled to interview her client.  However, our analysis does not end there because Gormley must establish that the summary-judgment record meets the Bright factors for the state-created danger doctrine.

---

[10] At the summary-judgment hearing, defendants did not argue that the Workers' Compensation Act barred Gormley's federal and state civil-rights claims.  Because "issues not raised below will ordinarily not be considered on appeal," N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 339 (2010), we therefore do not address this issue.  It is worth noting, however, that it is questionable whether the workers' compensation bar -- a state statutory immunity -- can overcome a federal civil-rights claim.  See Martinez, supra, 444 U.S. at 284 n.8, 100 S. Ct. at 558 n.8, 62 L. Ed. 2d at 488 n.8 ("Conduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law."  (citation and internal quotation marks omitted)).

Moreover, we do not have the benefit of a record or argument on which to determine whether the alleged federal and state civil-rights violations constitute an "intentional wrong" sufficient to overcome the workers' compensation bar.  See Laidlow v. Hariton Mach. Co., 170 N.J. 602, 617 (2002) (barring third-party suit against employer unless plaintiff can show "intentional wrong," which "encompass[es] acts that the employer knows are substantially certain to produce injury even though, strictly speaking, the employer does not will that result").

36

A review of a case comparable to the present one will help inform our analysis of the state-created-danger doctrine. In L.W. v. Grubbs, the United States Court of Appeals for the Ninth Circuit reinstated a Section 1983 cause of action by a prison nurse who claimed that her defendant prison supervisors, after leading her to believe that she would not be left alone with violent sexual offenders, then placed her "in unguarded proximity with an inmate whose record they knew included attacks upon women." 974 F.2d 119, 120-21 (9th Cir. 1992), cert. denied, 508 U.S. 951, 113 S. Ct. 2442, 124 L. Ed. 2d 660 (1993). The nurse was "raped and terrorized" by the inmate. Ibid. The Ninth Circuit rejected defendants' arguments that the Section 1983 claim was infirm because the nurse "was not in custody" or because of her "status as an employee." Id. at 120-21. The court also distinguished Collins, noting that the nurse in L.W. alleged not just a general right to a reasonably safe workplace but that "the [d]efendants took affirmative steps to place her at significant risk, and that they knew of the risks." Id. at 122.

VI.

A.

We now apply the Bright state-created-danger test to the summary-judgment record before us. First, we conclude that

37

Gormley was a member of a discrete class of victims subject to the foreseeable harms set in motion by defendants. Cf. Bright, supra, 443 F.3d at 281. Ancora was a state psychiatric facility controlled and supervised by defendants, particularly Ancora's Chief Executive Officer, defendant Wood-El. Many of the residents of Ancora were involuntarily committed because of mental illnesses that rendered them a danger to themselves or others. Within the confines of Ancora -- a locked facility -- hospital officials controlled and restrained the movements of residents and visitors. Cf. DeShaney, supra, 489 U.S. at 200, 109 S. Ct. at 1006, 103 L. Ed. 2d at 262 (holding that substantive due process is implicated when the State acts affirmatively to "restrain[] the individual's freedom to act on his own behalf -- through incarceration, institutionalization, or other similar restraint of personal liberty" (emphasis added)). Despite the control defendants exercised over Ancora, between October 2003 and December 2005, patients committed 3846 assaults. Of that number, 810 of the assault victims were visitors and staff, resulting in 200 injuries. Professionals, such as lawyers and psychiatrists, were required to meet with their clients and patients in the ward's day room, where thirty-five to forty psychiatric residents would mill about. Some of those residents were psychotic, "going off" and "screaming" in a scene described as "bedlam." Fights frequently broke out in the

38

day room, and attorneys and psychiatrists often became the victims of assaults committed by patients. Three staff psychiatrists testified that they had been the victims of patient assaults. Gormley's supervisor at the Office of the Public Advocate was attacked by patients three times at Ancora before the assault on Gormley. The potential for violence was so palpable that Gormley positioned her chair with her back to the wall to see from what direction an attack might come.

What is striking is not that the brutal assault on Gormley in the ever-noisy and tumultuous day room was an extraordinary event but that it was rather quite ordinary. Assaults in the day room were not unexpected but fairly foreseeable. Gormley was a member of a discrete class of foreseeable victims -- professionals required to meet in the volatile day room with patients.

As made clear in Collins and L.W., Gormley's status as a state employee does not render her powerless to seek vindication of her constitutional rights. See Collins, supra, 503 U.S. at 119, 112 S. Ct. at 1065, 117 L. Ed. 2d at 269 ("The employment relationship . . . is not of controlling significance.").

We also conclude, viewing the evidence in the light most favorable to Gormley, that defendants, particularly Wood-El, affirmatively used their authority to create the danger that made Gormley more vulnerable to the assault. Gormley was not

acting in the "free world" but rather in a locked institutional environment over which defendants exercised total control, including control over where Gormley met with her client, B.R. Cf. DeShaney, supra, 489 U.S. at 201, 109 S. Ct. at 1006, 103 L. Ed. 2d at 262. B.R. had a constitutional right to assigned counsel, S.L., supra, 94 N.J. at 142, and Gormley was designated by the Office of the Public Advocate to be her counsel. Gormley could not meet with B.R. off-site in her own office. She had to see B.R. at Ancora and submit to its regulations. Meetings between family members and patients were conducted in quiet, private rooms supervised by staff. Attorneys interviewing their clients for constitutionally required commitment hearings, however, were relegated to the explosive day rooms, where no security guards were posted.

Defendants not only controlled and restrained Gormley's physical movements, but they also possessed knowledge of the special dangers that B.R. might pose to the unsuspecting attorney, who was meeting her client for the first time. The institution assigned B.R. Continuous Visual Observation status because of the particular safety risk the patient posed to herself and others. A staff member, who presumably knew of B.R.'s CVO status, brought her to the day room -- brought her in contact with Gormley. But no one told Gormley of the heightened-risk assessment. When Gormley sat catty-corner to

40

B.R. because the din in the day room made a confidential, lawyer-client conversation impossible -- that was the environment defendants had created, an environment conducive to the many assaults that frequently occurred in the day room. Having brought the dangerous patient together with the attorney in an unsecured setting, Gormley literally was left to fend for herself when she was viciously attacked.  Cf. Bowers, supra, 686 F.2d at 618 ("If the state puts a man in a position of danger from private persons . . . it is as much an active tortfeasor as if it had thrown him into a snake pit.").  Gormley's injuries were not a result of defendants' inaction, but the result of their protocols, the affirmative steps that created an institutional environment in which patients could freely attack their attorneys and psychiatrists.

Last, under Bright's shock-the-conscience standard, Gormley has presented sufficient evidence to go forward on her claim that defendants acted with deliberate indifference to the foreseeable dangers threatening the physical safety of attorneys constitutionally assigned to represent committed patients.  The expert testimony presented suggested that the level of violence at Ancora was unique to that institution.  In the two years before B.R.'s assaultive conduct, defendants kept records of thousands of assaults committed by patients at Ancora, including hundreds of assaults committed against staff and visitors, such

as Gormley. No one can argue that defendants did not have time to deliberate over those dismal statistics. Defendants are not called to answer because of a split-second decision made in the heat of some immediate crisis. Giving Gormley the benefit of the most favorable evidence and inferences, defendants executed a policy, over a course of years, in complete disregard of the known danger that mentally disturbed patients were attacking professionals, such as Gormley, in the ward's day room. The Constitution required that Gormley or some other attorney represent B.R. at her upcoming commitment hearing. Gormley was totally dependent on Ancora to provide for her safety while she was in the facility. Cf. Youngberg, supra, 457 U.S. at 324, 102 S. Ct. at 2462, 73 L. Ed. 2d at 42 (noting that State had "unquestioned duty to provide reasonable safety for all . . . personnel within the [psychiatric] institution"). Even after the assault on Gormley, defendant Wood-El stated that she was not required to make any changes in the manner in which "attorney/patient visits were handled." That expression of complacency with the ongoing violence committed against attorneys at Ancora might be viewed by a jury as shocking by itself.

When the evidence is viewed in the light most favorable to Gormley, as it must be at this stage, we conclude that a rational jury could find that all four factors in the Bright

42

test have been met and that defendants therefore violated Gormley's substantive-due-process right to be free from state-created dangers under the Fourteenth Amendment of the United States Constitution.[11]

B.

A brief response to the dissent is in order, keeping in mind that the facts must be viewed in the light most favorable to Gormley. What makes the egregious -- and hopefully rare -- facts in this case conscience-shocking is the totality of the circumstances -- a standard commonly used in our constitutional jurisprudence. See, e.g., State v. Yohnnson, 204 N.J. 43, 64 (2010) (using totality of circumstances to determine whether defendant's confession involved knowing, voluntary, and intelligent waiver of Fifth Amendment right against self-incrimination); State v. Pineiro, 181 N.J. 13, 22 (2004) (using

_____

[11] We do not address Gormley's argument that her "special-relationship" with Ancora is a separate basis for liability because, in the context of the facts before us, that relationship is subsumed within state-created-danger liability. Indeed, some courts have questioned whether there is a distinction between special-relationship and state-created-danger liability. See Paine v. Cason, 678 F.3d 500, 510 (7th Cir. 2012); Ketchum v. County of Alameda, 811 F.2d 1243, 1247 (9th Cir. 1987); Estate of Gilmore v. Buckley, 787 F.2d 714, 722 (1st Cir.), cert. denied, 479 U.S. 882, 107 S. Ct. 270, 93 L. Ed. 2d 247 (1986). But see Kneipp, 95 F.3d at 1209 n.22 (viewing "special relationship" and state-created danger as distinct). At least for our purposes here, we do not have to decide whether those doctrines are different.

43

totality of circumstances to determine whether seizure reasonable under Fourth Amendment).

We cannot look at individual factors in isolation, as does the dissent.  No singular brushstroke reveals the whole picture.  This is a case not just about statistical evidence of a staggering number of assaults that occurred in a psychiatric hospital, although those statistics certainly suggested that violence was a predictable and accepted fact of life at Ancora.  Cf. Brown v. Plata, 563 U.S. ___, ___ n.4, 131 S. Ct. 1910, 1926 n.4, 179 L. Ed. 2d 969, 984 n.4 (2011) (discussing statistical evidence used to find that overcrowded prison conditions violated constitutional rights).  This is a case with detailed eyewitness testimony from psychiatrists and lawyers who were physically attacked and injured while carrying out their professional duties.  The violence occurred in a hospital where defendants controlled every aspect of life, including the physical movements of both patients and professionals, and where and how they met.  Gormley had no right to move freely at Ancora; she was not an agent in the free world.  Officials at Ancora were not just passive observers but -- giving Gormley the benefit of all reasonable inferences -- the architects of an environment in which anarchy reigned in the day rooms of Ancora.  All of these factors are part of the tableau suggesting that

defendants acted with deliberate indifference to the violence that threatened lawyers, such as Gormley.

Based on the factual record here, our finding that the conduct has crossed a constitutional threshold will not open a floodgate of litigation against public entities. The level of violence at Ancora was unique among psychiatric hospitals, and the dissent has cited to no comparable case involving other public facilities. No one has intimated, for example, that it is commonplace in schools for students and teachers to be physically attacked daily while their administrators stand about and look on indifferently to their physical safety.

Additionally, Congress passed the Federal Civil Rights Act to provide remedies not available under state law. See Haywood v. Drown, 556 U.S. 729, 741-42, 129 S. Ct. 2108, 2118, 173 L. Ed. 2d 920, 932 (2009) (holding that § 1983 actions may be brought in state courts against correctional officers for constitutional violations, notwithstanding state's explicit statutory bar on such actions). It makes no difference that a Section 1983 action may provide a different standard of proof or relief than in an action brought under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 59:12-3. State courts are compelled by the Supremacy Clause, U.S. Const. art VI, cl. 2, to apply federal law. See Felder v. Casey, 487 U.S. 131, 138, 108 S. Ct. 2302, 2307, 101 L. Ed. 2d 123, 137-38 (1988); Greenway

45

Dev. Co. v. Borough of Paramus, 163 N.J. 546, 558 (2000) ("A public entity may not use a state statute, such as the [Tort Claims Act], to abrogate a claimant's constitutional rights.").

We adopt the Bright test for conscience-shocking behavior, including its deliberate-indifference component. The dissent accepts this standard as well. Post at ___ (slip op. at 6-7). The test is a high bar to vault, and one common in substantive-due-process jurisprudence. See, e.g., Lewis, supra, 523 U.S. at 850, 118 S. Ct. at 1718, 140 L. Ed. 2d at 1060; Collins, supra, 503 U.S. at 128, 112 S. Ct. at 1070, 117 L. Ed. 2d at 275; United States v. Salerno, 481 U.S. 739, 746, 107 S. Ct. 2095, 2101, 95 L. Ed. 2d 697, 708 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience' . . . ." (citations omitted)). That standard, moreover, is higher than the negligence, or even gross negligence, standard under which public officials and employees may be found liable in Tort Claims Act cases. See L.W. v. Grubbs (II), 92 F.3d 894, 900 (9th Cir. 1996) (dismissing plaintiff's claims where, after remand for trial, jury found only gross negligence, rather than requisite deliberate indifference). Application of the Federal and State Civil Rights Acts -- and through them the substantive-due-process guarantee of the Fourteenth Amendment -- is not subversive of the Tort Claims Act, as the dissent suggests. The drafters of

46

the Tort Claims Act undoubtedly intended it to co-exist with federal law.

For these reasons we part ways with the dissent.

## VII.

### A.

We next consider whether the Appellate Division properly dismissed the civil-rights claims against defendants on the ground of qualified immunity.

Qualified immunity is a doctrine that shields government officials from a suit for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396, 410 (1982). Qualified immunity "is an immunity from suit," the right to avoid the rigors and costs of trial. Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815, 86 L. Ed. 2d 411, 425 (1985) (emphasis omitted). Whether an official is covered by qualified immunity is a matter of law to be decided by a court, "preferably on a properly supported motion for summary judgment or dismissal." Wildoner v. Borough of Ramsey, 162 N.J. 375, 387 (2000); see also Pearson v. Callahan, 555 U.S. 223, 232, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565, 573 (2009). "Qualified immunity balances two important

47

interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, supra, 555 U.S. at 231, 129 S. Ct. at 815, 172 L. Ed. 2d at 573.

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523, 531 (1987). The Third Circuit has "'adopted a broad view of what constitutes an established right of which a reasonable person would have known.'" Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989) (quoting Sourbeer v. Robinson, 791 F.2d 1094, 1103 (3d Cir. 1986), cert. denied, 483 U.S. 1032, 107 S. Ct. 3276, 97 L. Ed. 2d 779 (1987)). Officials are expected to "'apply general, well-developed legal principles,'" in "analogous factual situations." Ibid. (citations omitted). The Third Circuit "does not require 'relatively strict factual identity' between applicable precedent and the case at issue." Ibid. (citation omitted); see also Ryan v. Burlington Cnty., 860 F.2d 1199, 1208-09 (3d Cir. 1988) ("'Although officials need not predic[t] the future course of constitutional law, they are required to relate established law to analogous factual settings.'" (alteration in original)

48

(internal quotation marks omitted) (quoting People of Three Mile Island v. Nuclear Regulatory Comm'rs, 747 F.2d 139, 144 (3d Cir. 1984))), cert. denied, 490 U.S. 1020, 109 S. Ct. 1745, 104 L. Ed. 2d 182 (1989).

B.

We conclude that the right to be free from state-created dangers was clearly established at the time of the assault on Gormley in 2005. Since DeShaney, most federal circuit courts of appeals have adopted the state-created danger doctrine, including the Third Circuit in Kneipp in 1996. Significantly, in 1992, the Ninth Circuit applied the doctrine to an institutional setting analogous to Ancora. L.W., supra, 974 F.2d at 120 (female nurse assigned to work alone with prison inmate with known history of violence against women). Although this Court has yet to speak to the issue, in 2003 the Appellate Division in Gonzales, supra, adopted Kneipp's formulation of the state-created-danger doctrine, 357 N.J. Super. at 347, and, in 2004, reaffirmed state-created danger as a theory of liability, Estate of Strumph v. Ventura, 369 N.J. Super. 516, 525-26 (App. Div.), certif. denied, 181 N.J. 546 (2004). The decisional law of the Appellate Division is not only binding on our trial courts, but is an expression of the law of our State unless the New Jersey Supreme Court says otherwise. See Brundage v. Estate of Carambio, 195 N.J. 575, 593 (2008); see also Pressler &

49

Verniero, Current N.J. Court Rules, comment 3.1 on R. 1:36-3 (2014).

The contours of the state-created-danger doctrine were clearly established at the time of the attack on Lorraine Gormley in Ancora's day room. We hold that, given the history of violence at Ancora and the requirement that attorneys meet with their clients in crowded and chaotic day rooms populated by patients who were mentally ill and dangerous, reasonable hospital administrators knew or should have known that the conditions they created -- fraught with violence -- breached the substantive-due-process guarantee of the United States Constitution. This is not a case in which officials acting in good faith had to engage in perilous predictions about the application of the law or the foreseeable harm that might flow from their conduct.

We therefore reverse the Appellate Division, which dismissed the federal civil-rights claim on qualified-immunity grounds.

VIII.

Last, we add that the Appellate Division erred to the extent that it barred Gormley's claim for injunctive relief based on qualified immunity. First, we disagree with defendants' argument that Gormley waived her injunctive-relief

claim by not asserting it before the Appellate Division. Gormley succeeded before the trial court, and her injunctive relief claim was a live claim. She had no reason to bring the matter before the Appellate Division. Therefore, the doctrine of waiver has no applicability here.

More importantly, qualified immunity does not bar actions for injunctive relief. See, e.g., Wood v. Strickland, 420 U.S. 308, 314 n.6, 95 S. Ct. 992, 997 n.6, 43 L. Ed. 2d 214, 221 n.6 (1975) ("[I]mmunity from damages does not ordinarily bar equitable relief as well."), abrogated in part on other grounds by Harlow, supra, 457 U.S. at 817-18, 102 S. Ct. at 2738, 73 L. Ed. 2d at 410; Hill v. Borough of Kutztown, 455 F.3d 225, 244 (3d Cir. 2006) ("[T]he defense of qualified immunity is available only for damages claims -- not for claims requesting prospective injunctive relief."); Presbyterian Church (U.S.A.) v. United States, 870 F.2d 518, 527 (9th Cir. 1989) ("Qualified immunity is an affirmative defense to damage liability; it does not bar actions for declaratory or injunctive relief."). As such, Gormley would have had the right to pursue injunctive relief even had qualified immunity been granted to defendants.


IX.

We reverse the judgment of the Appellate Division granting qualified immunity to defendants and dismissing Gormley's

51

federal civil-rights claims.  We affirm the judgment of the Appellate Division based on the summary-judgment record, finding that the danger created by defendants that resulted in foreseeable injuries to Gormley violated the substantive-due-process guarantee of the United States Constitution.  We determine here only that, viewing the evidence in the light most favorable to Gormley, the trial court properly denied defendants' motion for summary judgment.[12]  We do not express any opinion on the merits of her claims, which ultimately a jury will resolve.  We remand to the Law Division for further proceedings consistent with this opinion.

CHIEF JUSTICE RABNER and JUDGE RODRÍGUEZ (temporarily assigned) join in JUSTICE ALBIN's opinion.  JUSTICE LaVECCHIA filed a separate, dissenting opinion, in which JUSTICE PATTERSON joins.  JUDGE CUFF (temporarily assigned) did not participate.

---

[12] On the record before us, defendants moved collectively for relief and did not differentiate the strength of Gormley's evidence against each individual defendant.

LORRAINE GORMLEY,

    Plaintiff-Appellate
    and Cross-Respondent,

        v.

LATANYA WOOD-EL, Chief
Executive Officer, Ancora
Psychiatric Hospital;
JENNIFER VELEZ, Current
Commissioner and WILLIAM
WALDMAN, Former Commissioner,
New Jersey Department of
Human Services; KEVIN
MARTONE, Current Assistant
Commissioner; and ALAN G.
KAUFMAN, Former Director,
Division of Mental Health
Services, Department of Human
Services,

    Defendants-Respondents
    and Cross-Appellants.

    JUSTICE LaVECCHIA, dissenting.

    Plaintiff, Lorraine Gormley, a Public Defender lawyer for involuntarily committed psychiatric patients, was attacked by a client, B.R., in a community "day room" in Ancora Psychiatric Hospital while meeting the newly committed woman for the first time. The unprovoked attack caused plaintiff serious injuries. Although plaintiff sought relief on a number of theories, in this appeal we consider her claim against State Department of Human Services officials and Ancora's past and present

administrators based on the theory that those defendants violated her substantive due process right to be free from state-created danger. Through that alleged due process violation, plaintiff seeks civil damages under 42 U.S.C.A. § 1983 (Section 1983). Although prior to argument before this Court plaintiff focused on her Section 1983 claim, she invokes the same reasoning to support her parallel claim for civil damages under the New Jersey Civil Rights Act (CRA), N.J.S.A. 10:6-1 to -2. Plaintiff also seeks injunctive relief under both statutes.

As the majority acknowledges, neither Section 1983 nor the CRA confers affirmative rights upon plaintiff. Therefore, plaintiff must establish a colorable substantive due process constitutional deprivation. I cannot agree with the majority's conclusion that a substantive due process state-created-danger claim has been presented in this matter. Moreover, even if I were to agree with the majority that a debatable claim has been set forth, I cannot conclude that such a claim was clearly established at the time plaintiff suffered her injuries. Thus, I would affirm the Appellate Division's judgment that found applicable the doctrine of qualified immunity, which shields the individual defendants from personal civil damages. I agree with the majority that claims for injunctive relief are not barred by the doctrine of qualified immunity. Nonetheless, for the

2

reasons that follow, I respectfully dissent from the judgment of the Court.

## I.

It is important at the outset to recognize that plaintiff was injured by a private actor, not a state actor. Generally, a state does not violate the Due Process Clause of the Fourteenth Amendment if it fails to protect its citizen from private violence. DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 195-96, 109 S. Ct. 998, 1003, 103 L. Ed. 2d 249, 258-59 (1989). In DeShaney, a case that involved violence by a private actor,[1] the United States Supreme Court stated that "the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Id. at 196, 109 S. Ct. at 1003, 103 L. Ed. 2d at 259. Having no obligation to provide such services, a state cannot be held liable for injuries that would have been avoided if such protection had been afforded. Id. at 196-97, 109 S. Ct. at 1003-04, 103 L. Ed. 2d at 259.

---

[1] In DeShaney, supra, a young boy was severely beaten by his father, resulting in permanent and substantial brain damage. 489 U.S. at 192-93, 109 S. Ct. at 1001-02, 103 L. Ed. 2d at 256-57. Prior to the incident that caused the brain damage, the county department of social services had failed to remove the boy from his father's custody for two years, despite the boy's repeated hospitalizations and department case workers' recorded suspicions of child abuse. Ibid.

3

However, an exception for persons in a "special relationship" with the state was noted.

The Supreme Court allowed for the viability of a Section 1983 claim based on a violation of substantive due process when a special relationship arises that imposes on the state affirmative duties of care and protection, such as when the state takes a person into custody against his will. By way of example, the Supreme Court discussed a duty to provide medical services to involuntarily committed mental patients, to provide medical services to people injured in the process of being arrested, and perhaps to avoid moving a child in state custody into an abusive foster home. Id. at 199-201 & n.9, 109 S. Ct. at 1005-06 & n.9, 103 L. Ed. 2d at 261-63 & n.9. That "special relationship" exception has spawned numerous cases in which plaintiffs have sought to impose Section 1983 liability on the basis of alleged violations of substantive due process. See, e.g., Henry A. v. Willden, 678 F.3d 991, 998-1001 (9th Cir. 2012); Nicini v. Morra, 212 F.3d 798, 808 (3d Cir. 2000) (en banc); Ying Jing Gan v. City of New York, 996 F.2d 522, 534 (2d Cir. 1993). It provides the basis for one of plaintiff's claims in this case.

A comment by the Supreme Court provides the genesis for a second theory of Section 1983 liability on the basis of an alleged substantive due process violation. This "state-created

4

danger" exception arises from the DeShaney Court's statement that "[w]hile the State may have been aware of the dangers that [the plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render [the plaintiff] more vulnerable to them." 489 U.S. at 201, 109 S. Ct. at 1006, 103 L. Ed. 2d at 262. That observation has been the basis on which a state-created-danger theory of liability has been accepted by several Circuit Courts of Appeals. See, e.g., Bright v. Westmoreland Cnty., 443 F.3d 276, 281 (3d Cir. 2006), cert. denied, 549 U.S. 1264, 127 S. Ct. 1483, 167 L. Ed. 2d 228 (2007); Kneipp v. Tedder, 95 F.3d 1199, 1205 (3d Cir. 1996); Reed v. Gardner, 986 F.2d 1122, 1125 (7th Cir.), cert. denied, 510 U.S. 947, 114 S. Ct. 389, 126 L. Ed. 2d 337 (1993); Dwares v. City of New York, 985 F.2d 94, 98-99 (2d Cir. 1993); Freeman v. Ferguson, 911 F.2d 52, 55 (8th Cir. 1990). Although the state-created-danger theory has not been adopted affirmatively by the United States Supreme Court, that Court's comment in DeShaney has been regarded as suggesting, by inference, the possibility of such cause of action, as the majority notes. See ante at ___ n.9 (slip op. at 28-29).

The Court of Appeals for the Third Circuit endorsed a state-created danger cause of action in Kneipp, and refined the elements for such an action in Bright. As established in Bright, supra, a state-created-danger cause of action arises

5

when:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.
>
> [443 F.3d at 281 (internal quotation marks and footnotes omitted).]

Like my colleagues in the majority, I accept that a Section 1983 claim may be advanced based on an alleged violation of substantive due process on state-created-danger and special relationship theories of liability, notwithstanding that the United States Supreme Court has yet to uphold the state-created-danger theory in any setting. Indeed, decisions of our Appellate Division already have signaled a willingness to employ the state-created-danger theory when and if an appropriate set of circumstances is presented, although no Appellate Division panel so far has found such a set of facts to exist. See Estate of Strumph v. Ventura, 369 N.J. Super. 516, 525-26 (App. Div.),

6

certif. denied, 181 N.J. 546 (2004); Gonzales v. City of Camden, 357 N.J. Super. 339, 347 (App. Div. 2003). I would be prepared to do the same for state-created danger, provided that the governing analysis conforms to the Bright test.

The Bright formulation employed by the Court of Appeals for the Third Circuit has much to commend it. It requires an affirmative act or acts by the state that created the danger or rendered the plaintiff more vulnerable. Bright, supra, 443 F.3d at 282-84. It is consonant with the Supreme Court's decision in DeShaney to find that the Constitution forbids state actors from affirmatively acting with willful disregard for a specific risk to an individual's safety in a way that creates a foreseeable, direct risk of harm to the plaintiff. Importantly, it requires that overall the government's action or inaction must shock the conscience. Id. at 281 (citing Cnty. of Sacramento v. Lewis, 523 U.S. 833, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 (1998)). The fact that state defendants simply "stood by," or that they could have "done more" in a particular set of circumstances, is insufficient without more to meet Bright's "shocks the conscience" requirement for culpability. The Bright standard calls for affirmative acts. Id. at 282-84. Acts of omission must be particularly scrutinized for egregiousness, which must include a showing of deliberate indifference and disregard for constitutional rights. See Henderson v. Gunther, 931 P.2d 1150,

7

1161 (Colo. 1997).

                                    II.

In this appeal, plaintiff argues two theories of liability under Section 1983:  special relationship and state-created danger.

Despite plaintiff's recognition that those theories of liability involve different standards, the majority melds the two theories into a single -- and novel -- cause of action.  See ante at ___ n.11 (slip op. at 43).  I cannot adopt that analytical framework.  The two theories are distinct and should be considered separately.

                                    A.

In respect of special relationship, I disagree that, as a visitor to Ancora, a state psychiatric hospital, plaintiff held a status equivalent to that of the institutionalized persons residing in that hospital.  Persons committed to hospitalization are committed to the State's care.  Although plaintiff is a lawyer whose professional obligation necessitated a consultative visit with her client, she shares the status of any family member, friend, or privately retained attorney or medical professional who enters the facility to visit a committed patient.  As such, she is far from the equivalent of a patient committed to the custody of the psychiatric institution against her will.  See DeShaney, supra, 489 U.S. at 199, 109 S. Ct. at

                                    8

1005, 103 L. Ed. 2d at 261.  No case cited by any party or the majority -- from any court -- supports the notion that plaintiff is somehow equivalent to a committed patient to whom the State owes a special relationship.

Special relationship cases hinge on custody or a similar deprivation of liberty.  See, e.g., Henderson, supra, 931 P.2d at 1157-58 (citing cases refusing to extend special relationship to circumstances beyond incapacitation or institutionalization).  Even if plaintiff's presence in a state psychiatric hospital effected a minimal restraint of liberty, I would not find it sufficient to create a special relationship.  As the Third Circuit has emphasized, DeShaney uses a test for "physical custody" when determining whether a plaintiff has a special relationship with the state.  See Ye v. United States, 484 F.3d 634, 635, 639 (3d Cir. 2007), cert. denied, 552 U.S. 1099, 128 S. Ct. 905, 169 L. Ed. 2d 729 (2008).  The closest plaintiff can come to citing an analogous case is the district court decision in Glaspy v. Malicoat, 134 F. Supp. 2d 890 (W.D. Mich. 2001), but that case is inapposite.  In Glaspy, a prison visitor case, prison officials took direct, affirmative acts toward the plaintiff (a visiting father), refusing his repeated requests to access a restroom to urinate.  Id. at 892-93.  As a result, the plaintiff suffered pain while waiting to use the restroom, and ultimately suffered the humiliation of urinating in his pants.

Ibid.

That district court case is distinguishable from this case because no direct affirmative act was taken toward plaintiff by state officials. The fact that Ancora's general visitation policy provided for plaintiff and certain other visitors to meet with patients anywhere on the ward generally, or in the community day room where patients congregated, does not, in my view, meet the level of control over plaintiff's personal behavior generally that gives rise to a special relationship. State actors exerted no direct control over plaintiff's movement, seating, or actions within the day room in which this attack took place. Nothing in this case comes close to resembling the direct assertion of control over the prison visitor that was central to the court's decision in Glaspy. See id. at 895. In sum, because plaintiff was never under custodial control in any sense that fits the DeShaney Court's test for physical custody, I find it impossible to conclude that, on these facts, plaintiff presents a case of special relationship liability.

B.

The analysis for state-created danger requires a different examination, specifically one that entails use of the four Bright factors:

(1) the harm ultimately caused was

10

foreseeable and fairly direct;

> (2) a state actor acted with a degree of culpability that shocks the conscience;

> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

> [Bright, supra, 443 F.3d at 281 (internal quotation marks omitted).]

In Ye, supra, the Third Circuit explained that the fourth factor can be broken down further, as follows:

> (1) a state actor exercised his or her authority,

> (2) the state actor took an affirmative action, and

> (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all.

> [484 F.3d at 638-39.]

That is the test that I would apply to plaintiff's claim. It is a rigorous test and, for me, it is far from clear that plaintiff has advanced a cause of action that is even debatable.

That plaintiff was subjected to serious injuries in the

11

course of performing her professional obligation is deplorable. But the sympathy to which she is entitled does not help fashion a constitutional rule of law in this matter that promotes desirable public policy and predictability in application. Indeed, I believe that, by letting plaintiff's claim go to the jury, the majority effectively embraces extensive Section 1983 state liability on the basis of state-created danger to persons visiting inpatients in state psychiatric hospitals.[2] The parameters of the liability created by the majority's holding are unclear. Nevertheless, that holding will impact numerous state, county, and municipal operational settings, such as schools, facilities for the developmentally disabled, and prisons, where persons are in the care and custody of governmental actors for all or substantial portions of most days.

---

[2] The majority also fashions on these facts a new CRA claim based on state-created danger. Circuit Courts reflect no consensus on the precise elements of a federal state-created-danger claim because the United States Supreme Court has not yet recognized the action. See generally Jeremy Daniel Kernodle, Note, Policing the Police: Clarifying the Test for Holding the Government Liable under 42 U.S.C. § 1983 and the State-Created Danger Theory, 54 Vand. L. Rev. 165 (2001). However, our Court has locked onto this case as a basis for establishing this new state-created-danger claim that will have the capacity to greatly expand tort-like liability for governmental actors. See Lewis, supra, 523 U.S. at 848, 118 S. Ct. at 1718, 140 L. Ed. 2d at 1059 ("[T]he Fourteenth Amendment is not a 'font of tort law to be superimposed upon whatever systems may already be administered by the States . . . .'" (quoting Paul v. Davis, 424 U.S. 693, 701, 96 S. Ct. 1155, 1160, 47 L. Ed. 2d 405, 413 (1976))).

Respectfully, I disagree with the majority as to whether any of the state officials' actions in this case were affirmative acts sufficient to "shock the conscience" under the Bright test. The majority gives great weight to the State's failure to specifically inform plaintiff about B.R.'s watch status.[3] However, the failure to inform plaintiff of the supervised watch status on which her client was placed is vastly different from the broken affirmative promises to the nurse in L.W. v. Grubbs, 974 F.2d 119 (9th Cir. 1992), cert. denied, 508 U.S. 951, 113 S. Ct. 2442, 124 L. Ed. 2d 660 (1993),[4] or the affirmative denial of the father's requests in Glaspy. Rather, B.R. was permitted to be among people in the day room and the State owed all the other patients in that room protection due to their special relationship to the State -- because they were committed to a psychiatric hospital. Nevertheless, B.R. and other patients were permitted to mingle, in the day room community, with themselves and in the company of others. That is where plaintiff met with her new client. It is far from

[3] B.R. was on "close visual observation" status, meaning an Ancora employee was required to maintain visual observation of her; there is no proximity requirement with this status. Aides were present in the day room when the attack took place.

[4] It bears noting that, on remand, the jury in L.W. determined that the defendant had acted with gross negligence, but not recklessness or deliberate indifference. L.W. v. Grubbs, 92 F.3d 894, 895 (9th Cir. 1996). Without a finding of deliberate indifference, the Court of Appeals for the Ninth Circuit threw out the jury verdict in plaintiff's favor. Id. at 900.

13

clear that the watch status for B.R. was unusual or that other patients in the room did not have a similar status. I cannot conclude that the state officials' failure to warn plaintiff of that status rises to a conscience-shocking level of culpability.[5]

Moreover, the majority places great reliance on statistics about past incidents of patient outbursts or assaults that occurred in the day room in the years preceding this incident. Overreliance on those statistics, in my view, skews this Court's analysis and requires comment. The fact that there had been numerous attacks in the day room in years preceding this incident does not predict that any particular patient would act out or attack another person in the room. There is no direct correlation between the past violence and the actual act of violence by B.R. toward plaintiff. A history of patient violence might affect staffing levels -- a resource-driven determination that is rightfully assessed under state tort law -- but it should not give rise to a constitutional violation

---

[5] Indeed, the majority's analysis fails to provide the slightest guidance on whether giving notice of such watch status would have been enough to avoid a substantive due process claim. Instead, my colleagues cite to a totality-of-the-circumstances approach that will leave government officials constantly uncertain as to whether they are at risk of personal liability. That is not the basis for sound governmental operation. Indeed, the Supreme Court has noted its reluctance to expand substantive-due-process liability "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S. Ct. 1061, 1068, 117 L. Ed. 2d 261, 273 (1992).

on the facts of this case.

Foreseeability, a necessary element under the Bright test, is not advanced by this statistical history of incidents involving past patients and conditions that may not bear any resemblance to conditions in the day room on the day in which plaintiff suffered her injuries. Bright's test requires that the danger must have been foreseeable and fairly direct. For me, information about other patients' behavior in the past does not make the harm visited on plaintiff foreseeable and fairly direct.

In sum, in my view plaintiff does not present a set of facts that debatably rise to a substantive due process violation. The Bright standard of conduct that shocks the conscience is not satisfied and therefore this claim should not advance past summary judgment.

### III.

Even if I were to agree with the majority's indulgent view of these facts, I would nonetheless conclude that plaintiff's case should only be allowed to go to the jury in limited fashion. I would not allow her novel claim for civil damages against the state governmental actors to proceed. In my view, there was no clearly established right to proceed on the basis of state-created danger on facts such as these that would have alerted government officials that they were violating any

15

clearly established constitutional right.

The doctrine of qualified immunity shields government officials from personal liability under Section 1983 "insofar as their [discretionary] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396, 410 (1982). Unless a government officer violates a right so clearly established that a reasonable official would have understood that his or her actions violated that right, governmental actors are free to perform their duties without being hobbled by the constant threat of individual liability under Section 1983. Anderson v. Creighton, 483 U.S. 635, 640-41, 107 S. Ct. 3034, 3039, 97 L. Ed. 2d 523, 531 (1987). The standard is intentionally set high before personal liability will attach. In my view, the doctrine of qualified immunity applies in this instance because prior cases do not clearly establish that a claim on the basis of state-created danger would apply under facts such as these.

Respectfully, I believe the majority overstates any similarity between this case and L.W., supra, in which a nurse, who was sexually assaulted by the prison inmate with whom she was assigned to work, had been affirmatively and falsely told that she would be under the protective supervision of guards

16

throughout her assigned task. 974 F.2d at 120. Unlike in L.W., no affirmative promises or false statements were given to plaintiff in this case. Similarly, the state officials in Glaspy, supra, exercised a degree of direct control over the father's actions that goes well beyond identifying places for visitors to meet with patients, as defendants did in this case. 134 F. Supp. 2d at 892-93. Neither the majority nor the parties cite any other cases that more persuasively establish the applicability of a state-created-danger cause of action in circumstances similar those of this case. Indeed, in a persuasive decision on similar facts, the Supreme Court of Colorado refused to find a triable claim of state-created danger based on an inmate's attack on a prison employee. See Henderson, supra, 931 P.2d at 1160-62 (rejecting claim based on failure to provide safe working environment).

In sum, if a cause of action were cognizable on these facts, I would find that the doctrine of qualified immunity applies in this instance. The doctrine should shield the defendant governmental officials from this action seeking to impose personal liability on them in their capacity as State Department of Human Services officials or administrators of Ancora Psychiatric Hospital. I do not believe that a state-created-danger theory for a cause of action like the one that plaintiff advances in this matter was clearly established under

17

law when the events underlying this action took place. Certainly, in my view, no case had been decided that found an actionable state-created-danger claim that resembled this one.

Moreover, I am concerned that this new theory of constitutional violation for state-created danger will supplant the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 to 12-3, and its careful delineation of public entity and individual liability. Under the Tort Claims Act, willful and wanton action will render a governmental employee bereft of state indemnification and therefore personally responsible for civil damages. See N.J.S.A. 59:10-1 (providing for indemnification of public employee when defended by Attorney General); N.J.S.A. 59:10A-2 (allowing Attorney General to refuse to defend public employee for act or omission not in scope of employment or fraud, willful misconduct, or actual malice). The majority's analysis, as applied in this case, suggests that a lesser showing will permit recovery against individual governmental officials under this new constitutional violation.

Thus, I would apply the doctrine of qualified immunity to bar plaintiff's money damages claims. As the majority notes, plaintiff also sought injunctive relief. Because qualified immunity does not act as a bar to equitable relief, Hill v. Borough of Kutztown, 455 F.3d 225, 244 (3d Cir. 2006), plaintiff's claim for injunctive relief would not be barred by

18

qualified immunity.  To that extent I do not disagree with the majority.

For the foregoing reasons, I respectfully dissent from the judgment of the Court.

JUSTICE PATTERSON joins in this opinion.

SUPREME COURT OF NEW JERSEY

NO.  A-101/106              SEPTEMBER TERM 2011

ON APPEAL FROM ____Appellate Division, Superior Court____

LORRAINE GORMLEY,

       Plaintiff-Appellant
       and Cross-Respondent,

           v.

LATANYA WOOD-EL, Chief
Executive Officer, Ancora
Psychiatric Hospital;
JENNIFER VELEZ, Current
Commissioner and WILLIAM
WALDMAN, Former Commissioner,
New Jersey Department of
Human Services; KEVIN
MARTONE, Current Assistant
Commissioner; and ALAN G.
KAUFMAN, Former Director,
Division of Mental Health
Services, Department of Human
Services,

       Defendants-Respondents
       and Cross-Appellants.

DECIDED          June 30, 2014
         Chief Justice Rabner          PRESIDING

OPINION BY          Justice Albin

CONCURRING/DISSENTING OPINION BY _____

DISSENTING OPINION BY          Justice LaVecchia

| CHECKLIST | AFFIRM IN PART/ REVERSE IN PART/REMAND | DISSENT |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | | X |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | | X |
| JUDGE RODRÍGUEZ (t/a) | X | |
| JUDGE CUFF (t/a) | ---------------------- | -------------------- |
| | 3 | 2 |

1